MODERN WOODMEN OF AMERICA v. HATFIELD et al.

(District Court, D. Kansas.  August 26, 1912.)

No. 1,313.

1. COURTS (§ 292*)—UNFAIR COMPETITION—USE OF CORPORATE NAME—SUIT BY FOREIGN CORPORATION.

A fraternal beneficiary society incorporated under the laws of a state may maintain a suit in equity in a federal court in another state to enjoin citizens of the latter state from forming a corporation under its laws for conducting the same business of insuring the lives of its members, and having a name similar to complainant's for the fraudulent purpose of deceiving complainant's members and the public and unlawfully appropriating complainant's business and good will.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 834; Dec. Dig. § 292.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

2. INSURANCE (§ 692*)—BENEFIT INSURANCE SOCIETIES—INCORPORATION—KANSAS STATUTE.

Gen. St. Kan. 1909, §§ 4303–4318, governing the organization of fraternal beneficiary societies, which in section 4309 provides that on the filing with the Superintendent of Insurance of a certificate stating the names of the applicants, and, inter alia, the "proposed corporate name of the association, which shall not too closely resemble the name of any similar association," if he shall find that its provisions are in accordance with section 4303, he shall indorse his approval thereon, and the certificate, when recorded, shall constitute the articles of association, do not vest in the superintendent a discretionary power to determine whether or not the name too closely resembles that of another association, but that question is one which may be determined by the courts in the first instance.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1832; Dec. Dig. § 692.*]

In Equity.  Suit by the Modern Woodmen of America against Rodolph Hatfield and others.  On demurrer to bill.  Overruled.

Ferry, Doran & Dean, of Topeka, Kan., for complainant.

Rodolph Hatfield, of Wichita, Kan., and J. G. Johnson, of Peabody, Kan., for defendants.

CAMPBELL, District Judge.  In this case the question now is on demurrer to the bill.  It appears from the bill that complainant is an Illinois corporation, a fraternal beneficiary society, having for its purposes fraternal relations among its members and financial aid to their beneficiaries upon their death; that it has been, and is now transacting business in this state under due authorization since 1883, has about 80,000 members, has paid out to beneficiaries of deceased members more than $100,000,000, and is now paying out $11,000,000 per annum.  Its organization as to head camp and subordinate officers is then set out, and the facts that the organization extends to 35 states of the Union and portions of Canada, and that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its revenues are derived from dues and assessments comprising general and benefit funds. It is then alleged:

"That the complainant has fixed laws, rules, and regulations which are passed and adopted by the Head Camp of the society; that, under these laws, rules, and regulations, the society is controlled and managed and its funds collected and distributed; that these laws, rules, and regulations, and all forms adopted by the Head and Local Camps thereunder, are the property and assets of the complainant society; that they are distinctive and well known to its membership and to the general public; that the local camps of the state of Kansas are known as 'the Kansas Woodmen,' and have been so known for many years; that the Modern Woodmen of America is known to be a strong, safe, well managed, fraternal beneficiary society, and that as such its name and the component parts thereof have a good will and property value; that the word 'Woodmen' is the principal part and the essence of the complainant's name; that the good will thereof has been established at great expenditure of time and money; and that as used in complainant's name it is a descriptive word, and that the public is in the habit of designating the complainant society by that name."

The defendants are alleged to be citizens of Kansas, and the amount in controversy is alleged to exceed $3,000, exclusive of interest and costs.

It is then alleged:

"That at a meeting held in January, 1912, the complainant, through its Head Camp, or lawmaking body, deemed it wise, and for the best interest of the society and its members, to increase the rates of assessments, and at said meeting lawfully increased the same, said increase to become effective January 1, 1913; that the defendants herein, and others acting with them, whose names are to the complainant unknown, and are too numerous to be here inserted, if known, confederated and conspired together, and are now confederating and conspiring under the pretext of opposing said increase of rates, to fraudulently and unlawfully appropriate to themselves and their alleged new society, the name, title, insignia, designations, laws, rules, regulations, and property of the complainant, Modern Woodmen of America; that in consummation of said unlawful conspiracy and fraudulent acts said defendants have flooded the Kansas membership of the Modern Woodmen of America, and the public, with letters, writings, and articles issued through a publicity bureau created by them, urging said Kansas members of the Modern Woodmen of America to desert said society and to enter and become members of an alleged new society under the name of 'The Kansas Fraternal Woodmen,' and are also soliciting the public to become members of said alleged new society; that in further consummation of said unlawful and fraudulent purposes said defendants have made application to the charter board of the state of Kansas for charter for their said alleged new society under the name and title of 'the Kansas Fraternal Woodmen'; that said defendants have incorporated in the proposed name of their new society the word 'Woodmen' for the purpose and with the intent of misleading and deceiving the members of the Modern Woodmen of America, and the public, and of thus appropriating the good will and fixed property rights of the complainant, by leading and causing said membership of the Modern Woodmen, and the public, generally, to believe that the new society is in truth and in fact a branch or part of the Modern Woodmen of America, well knowing that the Kansas members of said organization are known, and have for many years been known, as 'The Kansas Woodmen.'"

This, complainant charges, is fraudulent and unlawful, in that it is an attempt to appropriate its name and good will and mislead and deceive its membership and the general public, and is in violation of the state statutory prohibition against the adoption of a name too closely resembling that of a similar association. The

recitations of the bill are further amplified by setting forth details not necessary here to repeat. It is charged that the use of the name "the Kansas Fraternal Woodmen" will tend to and will mislead and deceive complainant's members and the general public, and will lead to confusion and to the great and irreparable injury of the complainant, and that, unless enjoined, the defendants will apply to the state superintendent of insurance for a certificate of authority to do business in the state under the name of "the Kansas Fraternal Woodmen."

The prayer is that defendants be enjoined from soliciting membership or distributing literature in the name of "the Kansas Fraternal Woodmen," or attempting to procure or procuring from the state charter board a charter in such name; or from the State Superintendent of Insurance a certificate of authority to do business in such name, or from using complainant's form of organization, etc., of complainant's funds, property, or good will.

The demurrer raises two questions: (1) That a foreign corporation doing business in a state only by license has no standing in a United States court of equity to question the right of citizens of the state granting it the license to take any necessary steps under the statutes of the state in which the court is located for the creation of a corporation bearing the same or similar name as the foreign corporation. (2) That complainant, a foreign corporation, cannot invoke a United States court of equity, sitting in Kansas, by injunction, to restrain or enjoin these defendants from applying to duly constituted tribunals, clothed with limited judicial and discretionary powers, for a charter and permission to do business in the state.

[1] In support of the first proposition, the defendants cite Lehigh Valley Coal Co. v. Hamblen et al. (D. C.) 23 Fed. 225, and Continental Ins. Co. v. Continental Fire Ass'n, 101 Fed. 255, 41 C. C. A. 326. In the former case it was held by the Circuit Court for the Northern District of Illinois, Judge Gresham presiding, that as the complainant was a foreign corporation, doing business in the state only by comity, and at the sufferance of the state, the complainant had no standing in the federal court to procure an injunction restraining the defendants from receiving stock subscriptions or taking any other steps necessary to be taken under the statute in the creation of the new corporation. It is to be noted that the defendants in that case, under a peculiar provision of the state law, were acting as commissioners to open books for subscriptions to the capital stock of the corporation, and are held by the court to perform a function under the laws of the state, if not as officers, at any rate as instrumentalities employed by the state. The court further held that, in view of the Illinois law prohibiting the issuance of a license to commissioners to receive stock subscriptions in the name of a corporation, the same as that of one or more other existing corporations, the question was primarily one for the Secretary of State. But the court does not hold that the foreign corporation, complainant in that case, is without

redress in the federal court against the defendants, acting not as state instrumentalities, but as officers of the corporation, for he says:

"I do not say what may be done if the defendants succeed in creating their corporation bearing the complainant's name, and a suit shall be brought by complainant to prevent individuals claiming to be officers or managers of such corporation from interfering with the complainant's business as already stated."

But subsequently, in the case of Peck Bros. & Co. v. Peck Bros. Co., 113 Fed. 291, 51 C. C. A. 251, 62 L. R. A. 81, the Circuit Court of Appeals for the same circuit decided the question in favor of the right of the foreign corporation to such relief, saying in reference to a contrary decision by an Appellate Court of the state:

"We are compelled, with deference, to differ with the learned court, if it intended to hold that incorporation under the laws of the state of Illinois protects one from the consequences of his own wrong. In a certain limited sense the sovereignty of the state had conferred the name. There is, however, in the term 'sovereignty' no magic to conjure by. It can confer upon individuals no right to perpetrate wrong. Nor do we think that the sovereignty of the state of Illinois sought to do that. It has a general law of incorporation, by which any body of men combining for the purpose of business may incorporate under any name they may select. The name is not imposed by the law, but is chosen by the incorporators. With that selection the sovereignty of the state has nothing to do. The act of sovereignty allowing incorporation is permissive, not mandatory. It sanctions the act of incorporation under the name and for the business proposed, if that name and that business be otherwise lawful. The sovereign by the act of incorporation adjudges neither the legality of the business proposed, nor of the name assumed. That is matter for judicial determination by a court having jurisdiction of the subject when the legality of the business or of the name is called in question. If one may not use the name imposed upon him in invitum so that it shall work wrong to another, by what token may he become incorporated under a name selected by himself to effect like wrong? And how is the sovereignty of a great state impugned by the denial to incorporators of a right to perpetrate such a wrong? Is it possible that a sovereignty of a state can be thus invoked to perpetrate a fraud? If it may be, then indeed will that sovereignty stand for oppression, and not for justice. Then could one who, in connection with a business to which his name had been attached and had given value to it, having disposed of their right to use that name to another, and so by the law prohibited from using it in connection with a like business under circumstances that would work a fraud, be enabled to effect the fraud by simply becoming incorporated under that name under the sovereignty of the state of Illinois. We cannot bend our judgment to the conclusion that a sovereign state designed thus to confer immunity for wrong. * * * With respect to the denial by the Supreme Court of Illinois of the right of a foreign corporation to contest in the courts of that state the right of a domestic corporation to the corporate name given it by the state in its articles of incorporation, even if that name be selected in fraud and be used to perpetrate a wrong, we are not concerned. The state of Illinois has the undoubted right to regulate its own courts in its own way, and, if it so will, to turn a deaf ear to a demand for justice. A federal court, however, is organized in part to listen to complaints of citizens and corporations of one state against citizens or corporations of another state, and its doors may not be closed by any ruling of a state tribunal. We study the decisions of the highest court of a state with respectful deference, but cannot be concluded thereby in such a case as the present one, when the ruling invoked, in our judgment, works a grievous wrong. We cannot follow the decision in the Hazelton Case. The doctrine of the Illinois court, as we conceive, is not in accord with the decisions of the federal and of other state courts. Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 94; Rogers Co. v. Rogers Mfg.

199 F.—18

Co., 17 C. C. A. 576, 70 Fed. 1017; Publishing Co. v. Dobbinson (C. C.) 72 Fed. 603; Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769; Holmes, Booth & Hayden v. Holmes & Atwood Mfg. Co., 37 Conn. 278, 293, 9 Am. Rep. 324."

In the second authority cited, Continental Insurance Co. v. Continental Fire Association, supra, there is not a distinct holding that a foreign corporation is without redress in such case. The court says:

"As under and in accordance with the laws of the state of Texas the defendant was incorporated under the specific name of the 'Continental Fire Association,' it has a prima facie right, certainly, under that name, to carry on in the state of Texas the business for which it was incorporated; and it would seem that a foreign corporation, with no such franchise, and doing business in the State of Texas only by license, is without standing to question the right of the defendant to use in its business the name granted and authorized by the State of Texas"—citing Boston Rubber Shoe Co. v. Boston Rubber Shoe Co., 149 Mass. 436, 21 N. E. 875.

The court then states that in the cases coming under its observation (citing them) the controversy has generally been between corporations of the same state. The court further observes that it has found no such case in which a foreign corporation has been heard to complain, and cites and quotes from Coal Co. v. Hamblen, supra. The weight of the court's observations upon this question as an authority is, however, considerably affected by the latter part of the decision, which holds that, however all this may be, if it is assumed that the corporate name of a business corporation is practically its trade-mark, and that equity will deal with it in a proper case on principles analogous to those governing the use of the trade-marks, still the facts in the case do not sustain plaintiff's contention.

In the case of Peck Bros. Co., supra, in which is cited Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 94, Mr. Justice Bradley, then of the United States Supreme Court, is quoted as observing in the latter case:

"As to the imitation of the complainant's name, the fact that both are 'corporate names is of no consequence in this connection. They are the business names by which the parties are known, and are to be dealt with precisely as if they were the names of private firms or partnerships. The defendant's name was of its own choosing, and, if an unlawful imitation of the complainant's, is subject to the same rules of law as if it were the name of an unincorporated firm or company. It is not identical with the complainant's name. That would be too gross an invasion of the complainant's right. Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another."

And from Hopkins on Unfair Trade:

"Where the defendant is a corporation whose corporate name includes a proper name, and was 'selected by the incorporators with the intent and for the purpose of deceiving the public into the belief that its goods are the goods of the plaintiff, such frauds will, of course, be enjoined."

The right of a foreign corporation to equitable relief by injunction against the fraudulent use of the same or similar name by a domestic corporation in the state and federal courts is further supported by the

following authorities: U. S. L. & H. Co. of Maine v. U. S. L. & H. Co. of N. Y. (decided by the U. S. C. C. for the Southern Dist. of N. Y. in 1910), 181 Fed. 182; Phila. Trust, Safe Dep. & Ins. Co. v. Phila. Trust Co. (U. S. C. C., Dist. Dela.) 123 Fed. 534 (decided in 1903); Knights of Maccabees of the World v. Searle et al. (decided by the Supreme Court of Nebraska in 1905) 75 Neb. 285, 106 N. W. 448; Atlas Assurance Co. v. Atlas Ins. Co. (decided by the Supreme Court of Iowa in 1907) 138 Iowa, 228, 112 N. W. 232, 114 N. W. 609, 15 L. R. A. (N. S.) 625, 128 Am. St. Rep. 189. As will be observed, one of the above cases involved a fraternal beneficiary association. That such associations, especially when incorporated, although not solely business corporations organized only for profit, may so protect themselves from injury resulting from the fraudulent use of the same or similar names by other like organizations, is supported by the following authorities: Knights of Maccabees of the World v. Searle, supra; Intern. Com. of Y. W. C. A. v. Y. W. C. A. of Chicago, 194 Ill. 194, 62 N. E. 551, 56 L. R. A. 888; Daughters of Isabella No. 1 v. National Order of D. A., 83 Conn. 679, 78 Atl. 333, Ann. Cas. 1912A, 822.

If, as charged in the bill and admitted by the demurrer, so far as the present consideration is concerned, the use of the name "the Kansas Fraternal Woodmen" is for the purpose of misleading and deceiving complainant's members and the general public, and of injuring and destroying the complainant, and of appropriating its business and good will and the use of such name in the manner and for the purpose charged will tend to and will mislead and deceive complainant's members and the public, leading to confusion and consequent injury to complainant in the benefit and good will attaching to its name, then no reason is conceived why the defendants may not be now enjoined from proceeding to perfect the organization, rather than wait until it is perfected, and then enjoin them from engaging in the business for which the organization is contemplated, unless that reason be found in defendants' second contention.

[2] Under the second contention, it is urged that the statutes of Kansas governing the organization and operation of fraternal beneficiary societies (General Statutes of 1909, §§ 4303 to 4318, inclusive) confer upon the State Superintendent of Insurance and possibly upon the state charter board, when considered in connection with the law creating that board, the duty and authority to determine whether the name proposed to be used by the defendants does or does not too closely resemble the name of complainant. Section 4303 is a legislative definition of a "fraternal beneficiary association," as that term is used in the act. The complainant and the proposed organization of the defendants come clearly within its terms. Section 4304 permits the continuance in business of all foreign associations coming within the definition in the preceding section, and then doing business in the state, and provides that they shall thereafter be governed by the act, and shall make reports and designate the State Superintendent of Insurance as agent for service of process as provided by the act. This, under the allegations of the bill, applied to complainant.

Section 4305 has reference to such foreign associations as may thereafter come in. Section 4306 provides for annual reports by every such association in answer to 25 stipulated questions and certain additional inquiries which the Superintendent of Insurance is authorized to make.

Section 4307 requires the appointment of the Superintendent of Insurance by foreign associations doing business in the state as agent for service of process.

Section 4308 provides for the issuance of permits by the Superintendent of Insurance to existing foreign associations doing business in the state.

Section 4309 provides in detail for the organization of such associations within the state, requiring that they shall file with the Superintendent of Insurance a certificate in writing, stating (a) the names and places of residence of the applicants; (b) proposed corporate name of the association, which shall not too closely resemble the name of any similar association; (c) its objects, purposes, etc.; (d) location of principal office; (e) number of directors, etc. The section then proceeds:

"When said certificate has been duly signed and acknowledged by the proposed incorporators, it shall be filed with the Superintendent of Insurance of this state, and, in case the Superintendent of Insurance shall find that its provisions are in accordance with section 1 of this act, he shall issue to said incorporators duplicate copies of said application, with his certificate indorsed thereon that said corporation has been duly authorized to conduct the business provided for in its said application according to the provisions of this act. When one of said certified copies shall have been filed for record in the office of the register of deeds of the county in which the principal office shall have been established, the remaining copy shall constitute the articles of association of said corporation. Provided, that said Superintendent of Insurance shall not issue said certified copies until said incorporators have paid him a fee of $25.00, and shall have satisfied him that there have been obtained bona fide applications for membership and insurance in said proposed association from at least 500 applicants, and that a benefit fund has been established, and cash deposited therein to an amount at least equal to twice the amount of the lowest certificate proposed by said association, and the proposed by-laws, benefit certificate, and application have been submitted to said Superintendent of Insurance, and found by him to be not in conflict with this act."

It is conceded by counsel, and I think properly so, that the term "application," where last above used, has reference, not to the application for permission to organize, but to the application which a proposed member of the organization must make to initiate the process by which he may become a member.

Section 4310 provides, among other things, that an association organized under this act shall be a body corporate and politic by the name adopted in the certificate of organization, with certain powers therein stated. Of the remaining sections only 4317 appears to have any relevancy to this inquiry. That section provides:

"None of the provisions of this act shall be construed as vesting discretionary power in the Superintendent of Insurance, but his construction of and decision under any section of this act shall stand and be binding on all parties in interest until reversed by a court of competent jurisdiction in an ac-

tion in the nature of an action in mandamus, to be prosecuted at his or its own cost, by any person or association dissenting from such construction or decision."

It is noted that this section first provides that the power lodged in the Superintendent of Insurance by the act shall not be construed as discretionary. Ordinarily, without such a saving clause, or provision for appeal, the decision of such a tribunal in a matter within its limited jurisdiction is final, and it was evidently to prevent such finality attaching to the Superintendent's decisions that this provision was incorporated in the act. If the question as to whether the name of defendant's proposed corporation too nearly resembles that of complainant is properly one primarily for the consideration of the Superintendent of Insurance, then the complainant should first make its contention before him, and, if unsuccessful there, must then avail itself of the remedy provided by the act. But is that a question which the Superintendent of Insurance is empowered to consider and determine? His jurisdiction as to such organization is special and limited by the terms of the act. It is true it is provided that his construction of and decisions under any section of the act shall stand and be binding upon all parties in interest until reversed as provided. But this must be construed as confined to such constructions and decisions as the act in other sections empowers him to make. If by the terms of the act he must issue the certificate if he find in favor of the applicants as to other features, regardless of the fact that in his judgment the name too closely resembles that of another association, then a decision by him of that question is futile. When the certificate of the proposed corporation setting forth the several things required by the act, duly signed and acknowledged, is filed with the Superintendent of Insurance, if he shall find that its provisions are in accordance with the first section of the act, he is required to issue his certificate, provided the requisite fee is paid, the requirements as to applications for membership and insurance and cash deposit complied with, and the proposed by-laws, benefit certificate, and application have been submitted to him, and found to be not in conflict with this act. A consideration of the question as to whether the provisions of the certificate are in accordance with the first section does not involve the question of similarity of names, nor do I find that it is involved in the finding which the Superintendent of Insurance must make under the proviso.

From a consideration of the entire act, I conclude that, while the act provides against the use of a name too closely resembling that of another association, it does not repose in the State Superintendent of Insurance the power to determine that question, but, as suggested in the Peck Bros. Case, supra, leaves it for the determination of the courts in a proper action. It follows that the Massachusetts authorities cited by demurrants do not apply here as to the Superintendent of Insurance (Gregg v. Mass. Medical Society, 111 Mass. 194, 15 Am. Rep. 24, and the Scottish Clans Case, 151 Mass. 558, 24 N. E. 918, 8 L. R. A. 320) for the reason that there it appeared that the question was one primarily for the special state tribunal or board. If it be true, as suggested, that possibly in view of the statute creating a

state charter board, organizations, such as we are now considering, must also apply to that board for a charter or permission to do business, which I think doubtful, the only duty imposed by the statute upon that board which could possibly give it jurisdiction to determine the question of too near resemblance of names is the provision that it shall determine the "good faith" of the proposed organization. That, in my opinion, has reference to the honest intention of the organizers to actually and in good faith carry on the business indicated in their proposed articles of incorporation, but does not include a consideration of the question as to whether the proposed name too closely resembles that of some other.

In view of the foregoing considerations, I find that the demurrer should be overruled; and it is so ordered.