Most Worshipful Widows' Sons Grand Lodge of Ancient Free and Accepted Colored Masons of Pennsylvania Incorporation Case.

Argued November 14, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*John Francis Williams,* with him *Wilbur C. Douglass,* for appellant.

*William T. Connor,* with him *Hardie Scott,* for appellee.

OPINION BY ARNOLD, J., April 16, 1947:

An application was made under the Nonprofit Corporation Law to the Court of Common Pleas No. 1 of Philadelphia County for a charter of a corporation to be known as "Most Worshipful Widows' Sons Grand Lodge of Ancient Free and Accepted Colored Masons of Pennsylvania" (hereinafter called "Widows' Sons Grand Lodge"). It was opposed by the "Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Pennsylvania" (hereinafter called "Prince Hall Grand Lodge"). The court below referred the application to a master, whose recommendation of approval was adopted, and the Prince Hall Grand Lodge appealed.

This case illustrates how men contrive to appropriate the reputation of an old, established, fraternal order by assuming its name, and this without membership in, and against the will, of the fraternity to be exploited.

The nub of the controversy is in regard to the use of the words "Free and Accepted Masons". The applicants

insert the word "Colored" before the word "Masons", but Prince Hall Grand Lodge also is a Masonic body for colored men. The evidence taken shows the complete history of the exceptants.

Fraternal orders or lodges exist in great number and variety in our country, and many of them possess the public esteem because of the integrity and good works practiced by them through the years. Their purposes are benign and their objects worthy.[1] They emphasize man's duty to live as a human, social and unselfish being, and seek to discourage his living unto himself alone. Such fraternities are woven inextricably into the weft and warp of the web of our society. Their members are drawn from all walks of life and schools of thought, and they are characteristically democratic institutions. They therefore do not do well, nor long survive, in totalitarian countries, in which usually the first move of the dictator is to abolish both church and fraternal societies, for each emphasizes the individual dignity and liberty of men. They are entitled to the careful solicitude of the law and her courts.

Men seeing that such an organization has acquired prestige and praise, may pay it the compliment of imitation, and thus is formed a new fraternity with different name and ritual. But others conceive the idea of appropriating the name, and thereby tortiously acquiring its good repute. The motive may be covetousness, with an eye to the initiation fees and dues later to be converted into salaries and expenses. Or it may be retaliatory because of having been rejected for membership. Whatever the intent may be, its accomplishment begins with fraud, both on the original order and upon those who seek membership. Such schemes should not prevail. The principles hereinafter enunciated apply not only to

---

[1] If the appellative of the lodge, and the title imposed upon its officers, savour slightly of hyperbole, this is but a harmless, and perchance, charming idiosyncracy.

the fraternity now involved, but to all fraternal organizations.

The evidence in this case shows that Prince Hall,[2] a Negro, was initiated into the Masonic fraternity in Lodge No. 441, a military lodge of Irish registry, at Castle William, Boston Harbor, on March 6, 1775. With others of the fraternity he organized, in 1784, African Lodge No. 459, under a warrant issued by the authority of the Grand Lodge of England. This Grand Lodge of England was formed in 1717, but a schism developed and two Grand Lodges thereafter existed, dubbed the "Ancients" (which was, in fact, the younger), and the "Moderns" (the Grand Lodge of 1717). African Lodge No. 459 was instituted or warranted by the "Moderns". In 1813 the "Moderns" and "Ancients" were reconciled and united as one Grand Lodge. Similar Grand Lodges were evolved in Scotland and Ireland. All legitimate Masonic lodges are descended therefrom; in America through state Grand Lodges originally composed of lodges created by a Grand Lodge of the British Isles. Lodge No. 459 of Massachusetts became a mother lodge, and in accordance with the usage of the fraternity, issued patents or warrants for the foundation of new lodges, and finally itself became a Grand Lodge. Prince Hall was the head (Master) of African Lodge No. 459, and the head or Grand Master of it as a Grand Lodge. Among the lodges chartered by it was African Lodge No. 459 in Philadelphia. By the same evolutionary process it became the African Grand Lodge of Pennsylvania, and after the

---

[2] Prince Hall was born in 1735 in Barbados and came to Massachusetts in 1765. "Prince" was his christian name, and he did not profess to be of royal blood. He became a well-known, highly respected citizen of Boston, and was a clergyman whose life was given over to good works. He was, of course, greatly interested in alleviating the conditions of the colored people. He fought in our Revolutionary Army. At the conclusion of his life it was said of him: "This great soul was called from labor amidst the tears and solemn grief . . . of those who best knew him . . ." on December 4, 1807.

death of Prince Hall in 1807 it changed its name in honor of him to Prince Hall Grand Lodge.[3] Not only was its beginning legitimate, but it has existed and functioned continuously since 1815, and is the exceptant here. Under the evidence it is clear and uncontradicted that the Prince Hall Grand Lodge was, and is, the one and only source of legitimate Negro Masonic lodges in Pennsylvania.[4]

On the side of the applicants, under their own evidence, neither the petitioners nor their associates are members of the Masonic fraternity. None is a member of any lodge or Grand Lodge of that order. Instead, they belong to entirely spurious organizations which have usurped the name "Masons". Their organizations are either self-constituted and self-styled, or are descended from such self-styled bodies, which, with their members, likewise were entirely spurious. Of this there is no doubt. The situation here is *not* the case of a schism where both branches are composed of true members. If the applicants were imposed upon by the lodges which they joined, they are asking to be incorporated so that they likewise may impose upon others. If they were not imposed upon by the lodges which they joined, their instant application is a fraud. Their lodges, not Masonic, still have usurped the name "Mason". They claim that some usurpation of the name began a decade or two ago; and that by the "virtue" of this they have thus become Masons, their lodges legally and duly con-

[3] Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Pennsylvania.

[4] Grimshaw's "History of Freemasonry Among the Colored People in North America", received in evidence. See also the later works, "Negro Masonry in the United States"—Voorhis (1939), and "A History of Freemasonry Among Negroes in America"—Davis (1946). No bibliography is complete without the scholarly articles, too numerous to designate, by Melvin M. Johnson, former Dean of Boston University Law School. His work in this field is outstanding and authoritative.

stituted, and both legitimatized. But since their beginning was illegal and tortious, it may well be doubted that the illicit situation can any more grow into a lawful status than can the continuing cohabitation of a man and woman, unlawful from its inception, convert that illegal relationship into a lawful marriage. The basis of any doctrine of laches is public policy, a public policy whose object is the peace of society. Certainly in situations like this, the "peace of society" is not aided by a validation of such claims. Fraternal orders are not engaged in mercantile business, and the doctrine of laches applied in trade-mark and trade-name cases is not appropriate. The issue here is fraudulent representation, and not exclusive right, although, as we have said, Prince Hall Grand Lodge has such exclusive right. Nor did the applicants rely upon any quiescence on the part of Prince Hall Grand Lodge. Reliance and hope are different things. Neither did the applicants suffer hardship by any taking of a position on the faith that they would not be brought to book. It is also true that a fraternal society, by failing to enjoin a local lodge from the spurious, illegal use of the name, does not estop itself from objecting to the formation of a Grand Lodge whose very object is to organize other spurious, subordinate lodges, to propagate further the deception.

In this type of case the applicants do not want primarily to be incorporated. What they actually seek is a patent issued by the court, vouched for by the law, conferring upon them *a name*. If granted, they would then be able to exhibit the "patent" under the seal of the court, as the law's confirmation and recognition that they are truly Masons. Of course such a patent should be sought from the organization having authority to issue it. But, being unable to obtain it from the lodge authority, because they are not entitled to it, they seek to reach the same result by obtaining it from a court of law. They cannot impose upon the fraternity, but they

hope to impose upon the courts. It may be pointed out that Prince Hall Grand Lodge is not incorporated, nor is the Grand Lodge of Masons of Pennsylvania (white),[5] and generally neither subordinate nor Grand Lodges, white or colored, are incorporated.

Any fraternal order rightfully has the power to exclude from membership persons thought to be undesirable, and to discipline members if found recreant. Members of the organizations with which the applicants are connected of course cannot be governed by the legitimate body, the Prince Hall Grand Lodge. Nor could the latter or its constituent subordinate lodges exclude them from membership in the spurious order. Thus the true organization has neither power nor control over them. On the other hand, they have the power to injure the true fraternal order upon which they impose, and as to which, indeed, they may have been rejected for membership, and to whose rules they are never subject.

The master, for the court below, held that "no one order has the exclusive right to use the word 'Mason'", citing *Most Worshipful Grand Lodge A. F. & A. M. of West Virginia v. Most Worshipful Prince Hall Grand Lodge of West Virginia A. F. & A. M.* (W. Va.) reported in 111 S.E. 309. But in that case there was a schism and two Grand Lodges claimed the right to use substantially the same name. *Both were composed of legitimate members of the order,* and there was no question of anyone being an impostor. Without in anywise indicating that even in a schismatic organization the West Virginia ruling would be followed in this state (Cf. *Societa di Mutuo Soccorso, Christoforo Colombo v. Lombardo et al.,* 350 Pa. 530, 39 A. 2d 581) that case, for the reason indicated, is not an authority.

---

[5] The correct title: The Right Worshipful Grand Lodge of the Most Ancient and Honorable Fraternity of Free and Accepted Masons of Pennsylvania.

To the conclusion opposite to that of the master and court below there is a considerable volume of authority. The applicants in this case, or at least the prime mover, were refused a charter in the court of common pleas of Allegheny County [6] for a corporation to be called "The Most Worshipful Nehemiah Grand Lodge of Colored Masons of Pennsylvania." Again the purpose was to secure a patent for a name. In the common pleas of Lehigh County [7] injunction proceedings were brought by the white Grand Lodge of Masons of Pennsylvania against a spurious white organization. After the taking of much testimony, which forms a complete history of the devolution of the order from the first Grand Lodge of England in 1717, the respondents agreed to a consent decree against them. *In re Ancient Free and Accepted Masons Temple Association,* 71 P. L. J. 555, is a case of a similar situation. In the common pleas of Dauphin County [8] such a spurious white organization sought to force the registration of the insignia of the Masonic fraternity, for its own use, and upon objection by the Grand Lodge of Masons of Pennsylvania, the case was tried before a jury, which found the movers to be spurious. The case was the subject of three characteristically careful opinions of Judge BIDDLE of Cumberland County, specially presiding, in the last of which he was joined by Judge WHITEHEAD (Lycoming County), also specially presiding. The verdict was sustained, the opinions being reported in 32 Dauphin County Reports, 233, 245 and 249. The appellate court cases in Pennsylvania are to the same effect: *Philadelphia Lying-In Charity v. Maternity Hospital,* 29 Pa. Superior Ct. 420; *Incorporation of the Matki Boski Bolesne Polish National Catholic*

---

[6] 1206 January Term, 1932.

[7] 4 September Term, 1943, in equity.

[8] The correct title is: George C. Phillips and Walter B. Sellers, In Their Own Behalf and in Behalf of the Most Worshipful Grand Lodge of Ancient Free and Accepted Masons, of the State of Pennsylvania and All Persons Interested Therein v. Charles Johnson, Secretary of the Commonwealth of Pennsylvania.

*Church,* 67 Pa. Superior Ct. 493; *Gilmore et al. v. Supreme Lodge of Loyal Orange Institution et al.,* 291 Pa. 568, 140 A. 530; *Polish National Catholic Church of St. Francis,* 31 Pa. Superior Ct. 87; *Charter of Iron City Lodge No. 17, Improved Benevolent & Protective Order of Elks of the World,* 39 Pa. Superior Ct. 365; and the tendency of the decisional law in Pennsylvania is to give full protection to the name of a legitimate organization, fraternal, religious or charitable, and whether a corporation or not. In these cases the courts first determine whether the one organization has the rightful use of a name or distinctive part thereof, and second, whether the other party, by taking a similar name, will commit a fraud on the original. In testing the latter the courts have to determine whether an organization alleged to be usurping the right is spurious insofar as the legitimate organization is concerned. In making this determination it must be kept in mind that it is the antithesis of justice to permit the reputation of such fraternal order to be seized and utilized by those who are not members of it. The fact that they may be members of some organization tortiously adopting a somewhat similar name does not change the legal situation. Such has frequently been decided. In the present case the words "Mason" or "Masonic"; in other cases "Elks",[9] "Knights of Pythias",[10] "Maccabees",[11] "Woodmen",[12] "Odd Fellows".[13]

There are two leading cases in the United States. In *Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World et al.,* 98 N. E. 756,[14] the New York Court of Appeals (in an

[9] *Charter of Iron City Lodge No. 17, Improved Benevolent & Protective Order of Elks of the World,* 39 Pa. Superior Ct. 365.

[10] *Grand Lodge, K. P. of North and South America v. Grand Lodge K. P.,* (Ala) 56 So. 963.

[11] *Knights of Maccabees of the World v. Searle et al.,* (Neb.) 106 N. W. 448.

[12] *Modern Woodmen of America v. Hatfield et al.,* 199 Fed. 270.

[13] *Emory et al. v. Grand United Order of Odd Fellows et al.,* (Ga.) 78 S. E. 922.

[14] Fully annotated, L. R. A. 1915 (B) 1074.

opinion by Judge WILLARD BARTLETT) the legitimate body was protected against the use of the name for a similar enterprise by those not entitled thereto. It was pointed out that the legitimate organization, although not engaged in trade, industry or business, was entitled to protection from the improper use of its name by others. In the course of the opinion it was stated: "Indeed, the plaintiff's organization has become so well and widely known simply as Elks . . . that the assumption of a title containing that appellation by any other independent benevolent corporation or fraternal order would in and of itself convey the false impression that there was some connection between them. Therefore the learned judge . . . was right in enjoining the defendant from in anywise using the word 'Elk' or 'Elks' as part of its title or incorporation. The case would be quite different if the members of the defendant organization had ever been members of the plaintiff corporation, and had seceded therefrom . . . In that event, the representation that the members of the defendant were Elks, or had been Elks, would be true as matter of fact . . ." The Supreme Court of the United States denied a writ of error in this case.

The second leading case is *Grand Lodge of Improved, Benevolent and Protective Order of Elks of the World v. Grand Lodge, Improved, Benevolent and Protective Order of Elks of the World, Inc. et al.,* 50 Fed (2d) 860, in which Judge JOHN J. PARKER wrote for the Circuit Court of Appeals:[15] "It was entitled to enjoy the fruits

---

[15] Additional excerpts are:

"In the extension of membership, the name of the order is of great value to it, as under that name it has acquired a reputation for fraternal and charitable work which appeals to those from whom its membership is recruited."

"In the case at bar, complainant for more than a quarter of a century had enjoyed the use of its name and had built up thereunder a large fraternal order among the colored people of the United States. Its fraternal, charitable, and educational activities had commended

of the organization which it had built up, unhampered by the efforts of others to appropriate to themselves its corporate name with the advantages thereto attaching." " 'Where a corporation has appropriated and used a name for such length of time as to become identified by the name, and had established a character and reputation under it, it is a fraud upon the corporation and the public if this name be assumed by others under such circumstances as would lead the public to believe that they constitute the original corporation. . . .' " " 'To establish a cause of action for unfair competition it is not necessary to prove an exclusive right in plaintiff, i. e.,

---

it to the public, and had given membership therein a value to the people from whom it recruited its membership. It was entitled to enjoy the fruits of the organization which it had built up, unhampered by the efforts of others to appropriate to themselves its corporate name with the advantages thereto attaching. If the Virginia members were dissatisfied, they, of course, had a right to withdraw and organize a new order; but they had no right, if they did so, to adopt the name of the original order or to hold themselves out as a branch of that order."

"It is argued that complainant has abandoned the right to be protected in the use of its name by allowing the use of same by various organizations of colored Elks in different parts of the country. We do not think, however, that this position can be sustained upon the record. It is true that charters were obtained from various states by the Elks resident therein and that these charters were obtained with the approval of the Grand Lodge; but it appears that these were but the incorporation of the lodges within the respective states which at all times remained subordinate to the Grand Lodge. There was a schism in the order about 1900, but this was healed a few years later, and since then all colored Elks of the United States, the evidence shows, have recognized the jurisdiction of the Grand Lodge and have exercised their rights as such under its dispensation."

" 'I quite agree that they have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person shall assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name.' "

that no one else ever has used the mark in the past or that no one else is using it now.' " " 'The issue is not one of title or exclusive right but of representation, viz., what does the mark as used by plaintiff represent or mean to the public, and what in contrast, does the mark used by the defendant represent.' "

Persons who believe that a new lodge or fraternal order should be formed, are perfectly free to organize one. If the purpose thereof is fraternal association, with or without ritual, and if the proponents believe that a new organization is needed, the *name* is not of great importance. If in fact it is a new order, it should, of course, bear a new name. The difficulty here, and usually, is that the people who seek to form such a new organization or lodge do not have such a purpose in view. They want not merely to form a new fraternal order, but as well to take over the reputation of an older, respected organization, although they know that the new organization is entirely illegitimate as to sanction by the old order, and is entirely distinct from it. The question may be asked, if the present applicants desire to associate themselves together as some sort of lodge, why did they not call themselves, for instance, "The Most Worshipful Grand Lodge of Builders", or "Carpenters", or by any other occupational, historical, racial, zoological or ornithological appellation? Why was the distinctive name of an old and honorable fraternity chosen? We think that there is but one answer.

It therefore follows that the purposes of the proposed corporation were not lawful, and that they were injurious to the community,[16] and the court below abused its discretion in approving the incorporation.

The order and decree of the court below is reversed and said application is refused at the cost of the appellee.

---

[16] See Nonprofit Corporation Law, §207, 15 P.S. 2851-207.