## ORDER OF OWLS v. OWLS CLUB OF McKEES ROCKS et al.

## ORDER OF OWLS v. GREAT HORNED OWLS ASS'N et al.

### Civ. A. 9097, 9189.

District Court of United States
W. D. Pennsylvania.
July 27, 1951.

---

2. Marshall v. International Mercantile Marine Co., 2 Cir., 1930, 39 F.2d 551, 552.

3. Cf. Anchor Line v. Jackson, 2 Cir., 1925, 9 F.2d 543.

Vincent M. Casey and Samuel J. Margiotti (of Casey, Power & Savage), Pittsburgh, Pa., for plaintiffs.

Edgar J. Cooke, Pittsburgh, Pa., for defendant Great Horned Owls Assn. et al.

Robert E. Carroll, Pittsburgh, Pa., for defendant John F. Gloeckner et al.

John J. McGrath, Pittsburgh, Pa., for defendant Albert Brown et al.

Cooke, Carroll & McGrath, Pittsburgh, Pa., for defendants.

MARSH, District Judge.

The plaintiff, Order of Owls, by Ferdinand D'Esopo, trustee ad litem, seeks to enjoin the Owls Club of McKees Rocks, Pennsylvania, the Great Horned Owls Association, and certain individual defendants from using names which it alleges are deceptively similar to that of the plaintiff. The cases having come on for hearing and the parties having stipulated that the evidence should be taken as if upon final hearing, the court enters the following

## Findings of Fact

1. The Order of Owls is a voluntary, unincorporated and nonprofit fraternal association which was founded on November 20, 1904, in the State of Indiana, and since January 31, 1929, has maintained its principal office and place of business in Hartford, Connecticut.

2. Ferdinand D'Esopo, Trustee ad Litem, the Supreme President of the Order of Owls, is a citizen of the State of Connecticut, resides in Hartford, and is authorized to institute this suit. D'Esopo has been Supreme President since January 1, 1929.

3. The Order of Owls chartered subordinate bodies in various states and places which are known as "Nests" while the parent association at Hartford is known as the "Home Nest." Several subordinate nests were established in the State of Pennsylvania and at the time this suit was instituted they were still in existence.

4. The Home Nest is the governing body of the Order of Owls.

5. The Order of Owls has a form of government known as the degree promotion system whereby promotion of members is made from one degree to another. There are four degrees. Promotion into the various degrees is dependent upon the will of the Home Nest. The members of the fourth degree annually elect the supreme officers who serve without pay; however, it appears that the supreme officers are entitled to receive initiation fees at the rate of $1 per member.

6. The subordinate nests are autonomous. The members of the subordinate nests have no voice in the election of the supreme officers or advancement of members to higher degrees. The order has approximately 1,500 subordinate lodges and approximately 100,000 members.

7. The dues of the members of the Order of Owls payable to the Home Nest are 40 cents annually, plus a few cents to the widows' and orphans' fund. All monies' are kept in one account at Hartford. When members become delinquent in the payment of dues, generally they are not expelled but continue to be members not in good standing.

8. The members of the Order of Owls are known collectively as "Owls"; an individual member is known as an "Owl." Club houses, clubs, lodges or nests of the members of the Order of Owls are known as "Owls Clubs."

9. The Order of Owls has expended funds in promoting its organization and in soliciting and securing its present membership by meetings of agents, printed matter, cuts, advertising and general publicity. To arouse interest in the order, the Home Nest occasionally sends out to subordinate nests literature, cuts, postcards and other advertising matter.

10. Members of the Order of Owls, at the time they become members, are required to take an oath that they will not join or organize any order of this name unless recognized by or under control of the Home Nest.

11. In 1911, the Home Nest of the Order of Owls granted a charter to Nest 1203 McKees Rocks, Pennsylvania, an unincorporated association. In the same year, pursuant to the laws of the Commonwealth of Pennsylvania, the members formed a nonprofit corporation under the name of "Nest 1203, Order of Owls." Its place of business is 350 Island Avenue, McKees Rocks, Pa.

12. Nest 1203, Order of Owls as a corporation had two classes of members. Those in the first class were known as beneficial members and were members of the national association (Order of Owls). They were obligated to pay dues to the Home Nest and had the right to vote at meetings of Nest 1203. Those in the second class were known as social members and were not members of the national association (Order of Owls). They were entitled to enjoy the social privileges of the club but were not entitled to vote at meetings of Nest 1203.

13. The defendants, Raymond Duerr and Nicholas Lemesh, are citizens of Pennsylvania, and in November, 1949, were beneficial members of Nest 1203, Order of

Owls, and were respectively, president and secretary.

14. The beneficial members of Nest 1203, Order of Owls were dissatisfied with the plaintiff organization, allegedly because of the following: lack of fraternal spirit and action; it did not hold a national convention during the past 42 years; it did not submit annual reports of per capita dues paid by the subordinate nests or reports of the widows' and orphans' funds contributed by the subordinate nests; it never submitted results of its annual elections of national officers who are elected by the members of the Fourth Degree; upon request, the national office refused to forward the names and locations of other subordinate nests; for many years it failed to publish a magazine. These alleged causes of dissent were in the main supported by the evidence.

15. In November, 1949, Nest 1203 named Duerr and Lemesh and four other members as its delegates to attend a meeting on November 27, 1949, at Lewistown, Pennsylvania, of a group of Owls' Nests known as the Four-State Association of Owls.

16. The nests composing the Four-State Association of Owls met for the purpose of promoting the welfare of the Order of Owls by bringing pressure upon the Home Nest to hold annual conventions, and otherwise change its policies generally from the degree system of governing the order to the representative system of governing the order and otherwise remedy the causes of dissatisfaction set forth in paragraph 14, supra.

17. Representatives of 14 nests attended the November 27, 1949, meeting of the Four-State Association of Owls, and officers were elected. Lemesh was elected trustee of the Association.

18. On January 22, 1950, the representatives of the subordinate nests composing the Four-State Association of Owls changed the name of that organization to "Fraternal Organization of Owls." Its purpose was the same as that of the Four-State Association of Owls. Duerr was elected vice president and Lemesh was elected trustee of the organization.

19. At no time was it the express purpose of the Fraternal Organization of Owls or its predecessor, the Four-State Association of Owls, to secede from the Order of Owls. The intention of its membership was to maintain an organization within the national order having for its purposes those stated in paragraph 16 supra. The organization was not authorized or sanctioned by the Home Nest.

20. The Fraternal Organization of Owls named and accepted the magazine "Owls" published by the defendants Duerr and Lemesh as its official magazine. The magazine "Owls" was not authorized or sanctioned by the Home Nest.

21. On April 20, 1950, the Supreme President, pursuant to authority contained in the constitution of the Order of Owls, revoked the charter of Nest 1203, Order of Owls on the grounds of insubordination, which he alleged consisted of: (1) membership in the Four-State Association of Owls; (2) membership in the Fraternal Organization of Owls; (3) its individual members, Raymond Duerr and Nicholas Lemesh, acting respectively as editor and business manager of the "Owls" magazine which was unauthorized by the parent association; and (4) other alleged subversive and disloyal acts on the part of members of the nest by attending meetings of Four-State Association of Owls and the Fraternal Organization of Owls.

22. In his letter of revocation, the Supreme President gave Nest 1203, Order of Owls fifteen days from April 20, 1950, to apply for reinstatement. Instead, on May 5, 1950, Nest 1203 unanimously voted to disaffiliate from the Order of Owls because of the "arbitrary action of the Supreme President in revoking its charter."

23. On May 12, 1950, this corporation changed its name from "Nest 1203, Order of Owls" to "Owls Club of McKees Rocks, Pennsylvania," one of the defendants herein. The place of business remained at 350 Island Avenue, McKees Rocks, Pa.

24. At the time the nest changed its name to "Owls Club of McKees Rocks, Pennsylvania," it had approximately 45 beneficial members and between 250 and 300 social members.

25. The defendants, Raymond Duerr and Nicholas Lemesh, are, respectively, president and secretary of the Owls Club of McKees Rocks, Pennsylvania.

26. Nest 1203, Order of Owls, never made application to the Home Nest for reinstatement of its charter, and the charter has never been reinstated and the members thereof have never made application for membership in another nest.

27. The Owls Club of McKees Rocks, Pennsylvania, has never made application to the Order of Owls for a charter and is not affiliated with the Order.

28. Prior to the revocation of the charter of Nest 1203 it had maintained a sign at 350 Island Avenue, McKees Rocks, Pa., consisting of three owls, each bearing the letter "O" on its breast in neon, sitting side by side on a branch, which is substantially the emblem of the Order of Owls.

29. After the revocation of the charter of Nest 1203, the defendant, Owls Club of McKees Rocks, Pennsylvania, substituted a sign consisting of a single owl with the letters C-L-U-B in a vertical line upon its breast.

30. After the revocation of the charter of Nest 1203, Order of Owls, the defendant, Great Horned Owls Association, was organized in compliance with the requirements of the Nonprofit Corporation Law of the Commonwealth of Pennsylvania, 15 P.S. § 2851-1 et seq. Its principal office and place of business is 603 Law and Finance Building, Pittsburgh, Pennsylvania.

31. The purpose of the Association is to "organize, maintain, operate and conduct a grand lodge of a purely social nature with power to create subordinate lodges * * *."

32. The defendants, John F. Gloeckner, Albert Brown and Nicholas Lemesh are respectively, the president, vice president and secretary of the Great Horned Owls Association and are all citizens of the Commonwealth of Pennsylvania.

33. The defendant, Lawrence J. McGraw, a citizen of Pennsylvania, was the treasurer of Great Horned Owls Association, but testified he is no longer connected with the corporation.

34. There were eighteen persons associated with the Great Horned Owls Association as incorporators and directors. One person was not and never was a member of the Order of Owls; eleven were former members of the Order of Owls, viz., Nest 1203; six were members of various nests of the Order of Owls. Three of the latter group, namely, Lawrence J. McGraw, Rudy Halpate and Madison Main, resigned from the Great Horned Owls Association shortly after its incorporation.

35. The Great Horned Owls Association notified various members of the Order of Owls that a convention of the Great Horned Owls Association would be held at Nest No. 101, 350 Island Avenue, McKees Rocks, Pa., on September 23-24, 1950. These premises were owned and occupied by the Owls Club of McKees Rocks, Pennsylvania, formerly Nest 1203, Order of Owls.

36. One of the purposes of this convention was to induce members of the Order of Owls and subordinate nests thereof to secede from the Order of Owls and affiliate with the Great Horned Owls Association.

37. The emblem of the Order of Owls consists of three owls, each bearing the letter "O" on its breast, sitting side by side on the same branch or rod and facing the observer. The emblem of the Great Horned Owls Association is a great horned owl sitting on a branch with a full moon in the background.

38. The Nests and members of the Order of Owls have continuously used the emblem in the form of pins, rings, pennants, printed matter, letterheads, and other paraphernalia.

39. The motto of the Order of Owls is as follows: "There is so much bad in the best of us, and so much good in the worst of us, it hardly behooves any of us to speak ill of the rest of us." The motto of the Great Horned Owls Association is as follows: "When speaking of your fellow man, and a good word can't be spoke,

it's best not to speak at all, like the old owl in the oak."

40. The greeting sign of the Order of Owls is "Hoo-Hoo." The greeting sign of the Great Horned Owls Association is "Yoo-Hoo."

41. The Great Horned Owls Association proposed to adopt a representative system of government and hold annual conventions, and otherwise initiate a national fraternity system.

## Discussion

■ It is well established that the courts will protect a benevolent, fraternal or social organization in the use of its name by restraining another organization from using the same name or one which is deceptively similar. Grand Lodge I. B. & P. O. Elks v. Grand Lodge I. B. & P. O. Elks, 4 Cir., 1931, 50 F.2d 860; Grand Lodge, K. P. v. Grand Lodge, K. P., 174 Ala. 395, 56 So. 963; International Committee of Young Women's Christian Association v. Young Women's Christian Association, 194 Ill. 194, 62 N.E. '551, 56 L.R.A. 888; Most Worshipful Widows' Sons Grand Lodge of A. F. and A. Colored Masons of Pennsylvania v. Most Worshipful Prince Hall Grand Lodge of F. and A. Masons of Pennsylvania, 1947, 160 Pa.Super. 595, 52 A.2d 333; Societa di Mutuo Soccorso, Christoforo Colombo v. Lombardo, 1944, 350 Pa. 530, 39 A.2d 581.

In the case of Most Worshipful Widows' Sons etc., supra, the Superior Court of Pennsylvania, after stating that the tendency of the decisional law in Pennsylvania is to give full protection to the name of a legitimate fraternal, religious or charitable organization, sets forth the following .procedure: "In these cases the courts first determine whether the one organization has the rightful use of a name or dis-

tinctive part thereof, and second, whether the other party, by taking a similar name, will commit a fraud on the original."

■ The Order of Owls was organized as a fraternal association in 1904. It is organized on the grand lodge system and has approximately 100,000 members and 1,500 subordinate lodges called "Nests." Unquestionably, it has the right to use the name "Order of Owls." Its nests are popularly known as "Owls Clubs" and its members as "Owls," and have been so known during the entire existence of the order. The distinctive part of the name is the word "Owls" and plaintiff's right to this part is fully established.

The principle issue in this case is whether the names adopted by the defendant corporations are deceptively similar and will tend to cause confusion and misunderstanding in the public mind, and to deceive and induce strangers to join or treat with the new organization in the belief that it was the old and well-known association.

■ If this is found to be the case the defendants will have committed a fraud upon the plaintiff which a court of equity will enjoin. We find this to be the situation and injunctions will be granted.

Talbot v. Independent Order of Owls, 8 Cir., 1915, 220 F. 660, is very similar to the instant case and involved this plaintiff in the earlier stages of its development.[1] There, as here, the charter of the nest had been revoked and the dissident members had formed a competing corporation. An injunction issued because the name and emblem of the defendant corporation were deceptively similar and would cause confusion.

In the case against the Owls Club of McKees Rocks, Pennsylvania, all of the members, about forty-five in number, were formerly members of the Order of Owls,

---

1. It appears in this case that the membership of the Order of Owls was about 200,000 members. In Peltyn v. The Improved Order of Owls of Pennsylvania, Inc. et al., No. 4445 March Term, 1928, in the District Court of the United States for the Eastern District of Pennsylvania, an unreported opinion by Judge Kirkpatrick, a copy of which was furnished by counsel for the plaintiff, indicates that the membership of the Order of Owls in 1928 "is in the neighborhood of 60,000, of whom more than half, by reason of refusal to pay dues to the central body, are not in good standing, although still members of the order." In the instant case it was testified that the membership was approximately 100,000.

who, after their charter was revoked, promptly and unanimously disaffiliated from the parent association. The corporation proceeded to change the corporate name and the sign in front of the corporation premises. The sign is an owl with "C-L-U-B" written vertically on its breast. It is beyond argument that the members of the Owls Club of McKees Rocks and the club building itself, unless restrained, will continue to be known respectively as "Owls" and the "Owls Club" to the detriment of the plaintiff.

In the case against Great Horned Owls Association, the deception and confusion in the name are equally apparent. In addition, the corporation has deliberately adopted the grand lodge system and intends to recruit subordinate lodges from existing Owls Clubs. It also adopted an emblem, motto and greeting deceptively similar to those in use by plaintiff. We take judicial notice of the Master's report in the proceeding to incorporate this defendant. He wrote: "The testimony in this case shows that there are various Owls Clubs located in Pennsylvania and some of these Clubs have been in existence for over forty years. Delegates from the Owls Clubs of McKees Rocks and Carnegie attended the meeting before your Master. They outlined the organization meeting by representatives from the Owls Clubs of Beaver Falls, Rochester and East Liverpool, Ohio. These various clubs have held regular meetings and are well organized. Some of the clubs are financially sound and are very active in the communities in which they are located * * * Your Master determines that * * * the various Owls Clubs elected delegates for the purpose of forming and incorporating a central governing body for all the Owls Clubs that will affiliate with it and be subject to the rules and regulations

* * * of the 'Great Horned Owls Association.'

* * * * * *

"Your Master concludes * * * that the purpose for the organization of the 'Great Horned Owls Association' is for the combining of the various Owls Clubs under one central governing body * *"

It was no coincidence that the corporation held its first convention at the Owls Club of McKees Rocks and circularized various members of the plaintiff association, in order to induce them and their respective nests to secede from the plaintiff association and affiliate with this defendant. The background, causes and purposes underlying the formation of the Great Horned Owls Association are set out with particularity and detail in the findings of fact. Taking them all into consideration, we are convinced that this corporation was deliberately formed to compete with the Order of Owls, to cause it injury and confuse the public as well as genuine members of the Owls and Owls Clubs.

The dominant word in this defendant's name is not "Horned" but "Owls" and it goes without saying that the use of this word in its name will enable it to reap an unfair benefit by capitalizing upon the reputation of the Order of Owls and its organization and efforts of almost a half century. The fact that Great Horned Owls Association was given so many characteristics of the Order of Owls repels any suggestion of fairness or bona fide intention on the part of its incorporators. Compare Knights of The Ku Klux Klan v. Independent Klan of America, D.C.Ind. 1926, 11 F.2d 881; Grand Lodge I. B. P. O. Elks v. Eureka Lodge No. 5, Independent Elks, 4 Cir., 1940, 114 F.2d 46.

Defendants contend that they are schismatic groups and entitled to use the word "Owls" in their respective names.[3]

---

2. Defendants also contend that plaintiff is not entitled to the exclusive use of the word "Owl" or "Owls" and cite Afro-American Order of Owls, Baltimore Nest No. 1 v. Talbot, 1914, 123 Md. 465, 91 A. 570. In that case, however, the court appears to have considered the fact that the parties were not in competition with

each other in that the Order of Owls excludes persons of African descent. The court enjoined the use of the emblem as being deceptively similar to that of the Order of Owls. The rationale of Grand Lodge I. B. & P. O. Elks v. Grand Lodge I. B. & P. O. Elks, supra, 50 F.2d at pages 864, 865, refutes this contention.

This contention is without merit. First of all, it seems that a schism is recognized when a considerable percentage of members of an organization split or divide into two discordant branches.[3] Members composing approximately $\frac{1}{20}$ of 1% of the whole number, in our judgment, are not to be accorded the dignity of a schism. They were not so identified in Talbot v. Independent Order of Owls, supra, nor in Peltyn v. The Improved Order of Owls, supra, (see footnote 1), nor in Grand Lodge I. B. P. O. Elks v. Eureka Lodge No. 5, Independent Elks, supra. The case last cited exemplifies the principle applicable to this situation. There it was argued, as it has been here, that inasmuch as defendants have been members of the order, they have the right, after seceding from it, to use so much of its name as will identify them as having been originally connected with it. The court said: "Reliance for this position is placed upon the decision of Supreme Lodge, Knights of Pythias v. Improved Order Knights of Pythias, 113 Mich. 133, 71 N.W. 470, 38 L.R.A. 658. As we pointed out in our former decision, however, the soundness of this Knights of Pythias decision is questionable. And see Creswill v. [Grand Lodge] Knights of Pythias, 133 Ga. 837, 67 S.E. 188, 134 Am.St.Rep. 231, 18 Ann.Cas. 453, and Emory v. Grand United Order of Odd Fellows, supra [140 Ga. 423, 78 S.E. 922]. Where a name, not merely generic or descriptive, is adopted by an order, there is no reason why seceding members should be allowed to use it. Such use by seceding members, over whom the order has no further control, has obviously every element of unfairness that would arise from use by strangers. To say that the defendants are 'Elks' and, therefore, have the right to use the word 'Elks' in the name of their organization is to beg the question. They cease to be 'Elks' when their connection with the organization is severed. When members of the order, they are 'Elks', not in any generic or descriptive sense of that word but in an imaginative sense. They are not elks, but men, and are called 'Elks' only because of membership in the order which has adopted that name. Upon separation from the order, their use of the name applicable to members of the order amounts to a fraud upon the order and upon the public and should be enjoined." [114 F.2d 48.]

In support of their schismatic argument, defendants cite Gilmore v. Supreme Grand Lodge of Loyal Orange Institution, 291 Pa. 568, 140 A. 530. In Gilmore, however, the court demonstrated that the "words 'Orange' and 'Orangemen' had acquired a definite signification long before the plaintiff association was organized."[4] The court said, however: "By breaking from the original lodge, the seceders lost the right to use its name or any other name so similar as to breed confusion, but did not forfeit their right to be known as 'Orangemen' or to use the word 'Orange,' when so done as not to interfere with, or prejudice the rights of the plaintiffs. Members of a fraternal order like the one in hand, by seceding, lose the right to use the name of the parent order or any similar name, but may choose a new one which will identify their principles, keeping clear from an identity with the old." It will be observed that the injunction affirmed in that case[5] restrained de-

---

3. See Gilmore v. Supreme Grand Lodge of Loyal Orange Institution, 1928, 291 Pa. 568, 140 A. 530, 531, where each of the contending factions had about 5,000 members.

4. In the instant case the words "Owl", "Owls", and "Owls Club" had no significance or meaning in relation to men prior to 1904.

5. In the Gilmore case the injunction affirmed by the Pennsylvania Supreme Court, 140 A. at page 531, was as follows: "The defendants and each of them

'be restrained perpetually from using the names and titles "Supreme Grand Lodge of the Loyal Orange Institution of the United States of America," and from using or employing the badges, emblems, rituals, or seals of said Supreme Lodge of the Loyal Orange Institution of the United States of America, or Loyal Orange Institution of the United States of America, and from making use of any part of said names or titles, or any name, title, or design naturally tending to mislead and to induce the belief that the defendant organizations and those in asso-

fendants from making use of any part of said names or titles or any name, title or design *naturally tending to mislead and induce the belief that the defendant organizations and those in association with them as lodges, officers or members, are in any way a part of the plaintiff or are in any way connected or affiliated therewith.*

Also in opposition to defendants' argument is Societa di Mutuo Soccorso, Christoforo Colombo v. Lombardo, 1944, 350 Pa. 530, 39 A.2d 581, where the Supreme Court of Pennsylvania in dealing with a schismatic group, held that since the seceding members are no longer affiliated with the parent association, they cannot use its name to its detriment and should be restrained. Also see Knights of The Ku Klux Klan v. Independent Klan of America, supra.

NOTE: The injunction would not restrain the defendants, McGraw and Brown, who are members of the Order of Owls, from being designated as "Owls," and using other indicia, so long as they and their respective nests remain in the Order.

## Conclusions of Law

1. This court has jurisdiction of the parties and of the subject matter.

2. Ferdinand D'Esopo, Supreme President of the Order of Owls and Trustee ad Litem, is authorized to institute this suit.

3. The name "Owls Club of McKees Rocks, Pennsylvania," is deceptively similar to the name "Order of Owls" and will likely cause confusion to the public, and may deceive and induce persons to join the defendant corporation in the belief that it is the well known plaintiff association.

4. The sign displayed on the property of the Owls Club of McKees Rocks, Pennsylvania at 350 Island Avenue, is deceptively similar to the emblem of the Order of Owls and would tend to mislead the public and members of the Order of Owls.

5. Continued use of the name "Owls Club of McKees Rocks, Pennsylvania" would permit the defendant corporation to reap unfair benefits from the reputation and existence of the Order of Owls of almost a half century.

6. The name, "Great Horned Owls Association," is deceptively similar to the name "Order of Owls" and will likely cause confusion to the public, and may deceive and induce persons to join the defendant corporation in the belief that it is the well known plaintiff association.

7. The emblem, motto and greeting adopted by the Great Horned Owls Association are deceptively similar to the emblem, motto and greeting of the Order of Owls, and were so designed in order to mislead the public and cause injury to the Order of Owls.

8. Continued use of the name "Great Horned Owls Association" would permit the defendant to reap unfair benefits from the reputation and existence of the Order of Owls of almost a half century.

9. Plaintiff is entitled to an injunction restraining the use of the word "Owl" or "Owls" in the names, signs, emblems, pins, paraphernalia, ritual, printed matter and advertising matter, etc., by the defendants, Owls Club of McKees Rocks, Pennsylvania, Great Horned Owls Association, and by any of the individual defendants named, or their associates.

10. The injunction shall not apply to individuals who are or in the future may become members of the Order of Owls.

11. The counterclaim for an accounting requested by the defendants, Raymond Duerr and Nicholas Lemesh, is dismissed for the reason that they are not members of the Order of Owls and have no present interest in the funds collected by the Home Nest.

12. The parties shall pay their own costs.

ciation with them as lodges, officers, or members are in any way a part of the plaintiff Supreme Grand Lodge of the Loyal Orange Institution of the United

States of America, or the Loyal Orange Institution of the United States of America, or are in any way connected or affiliated therewith; * * *.' "