Meier Stehstbrih'k,
Spec. Ref. In this litigation the plaintiffs seek an injunction restraining defendants and all other persons representing them from establishing or conducting lodges of “ Masons ” or auxiliaries thereof within the State of New York and from using such words or terms as “ Mason “ Masons ”, ‘1 Free and Accepted Masons ’ ’ or any colorable imitation thereof; likewise, from holding forth, publishing or employing rituals, etc. which are claimed by plaintiffs; and, incidentally, for money damages. Defendants’ answer pleads denials of the entire complaint and then alleges 12 separate defenses, and beginning with the second defense through the fourth defense, they rest on a claim of laches as against plaintiffs.
At the commencement of the trial the parties stipulated to the use by defendants of the paraphernalia, words, symbols, implements, etc., commonly used by the masonic fraternity, and that defendants sponsored and held public affairs since organization in New York State by which it held itself out to the public as a masonic organization. Other matters were stipulated which, when examined, will support the conclusion to which I have come.
The trial of this case consumed the greater part of nine days. The transcript of the oral testimony is 1,250 pages long with 76 plaintiffs’ exhibits and 68 defendants’ exhibits. It appears that, among others, well-versed, highly educated, recognized Negro historians were called as witnesses. In addition to numerous historical volumes there were innumerable pamphlets, theses and articles read, quoted from and considered. One of the exhibits was a microfilm principally of ancient documents covering approximately 600 plates. With great care I have examined each of these plates of microfilm through the courtesy of defense counsel furnishing to me a G-riscombe Microfilm Reader. Many of these are wholly illegible, undoubtedly due to the age of the original record from which the microfilm was made. Likewise these plates are not in chronological order. In those that could be deciphered, the name of Prince Hall appears as early as October, 1786. There are many references to the settling of the books (which undoubtedly refer to African Lodge No. 459). Some of these plates or panels are wholly irrelevant to the issues before me. There are any number *392 of plates with the names of various doctors and amounts for possibly services or “from the box ” followed by “ Contra” boxes which have nothing to do with this litigation. What all of this was offered for, I do not know. Then, again, there are a large number of these plates or sheets indicating that the lodge (undoubtedly African Lodge No. 459) met and then follows “ no work — lodge closed.” One of the plates or panels of the microfilm states: “Boston Nov. 7, 1807, Prince Hall Grand Master, deceased.” Whether implicit in the title of grand master it referred to the grand master of a Grand Lodge or whether it was merely that he was the master of the lodge and they termed him “ Grand ” no one can tell. In any event, African Lodge No. 459 continued its activity as disclosed by many of these plates of the microfilm with no entry of importance or relevancy in this case. The meetings appeared to have been held regularly. Some recorded merely that they met and transacted business and then closed; others, that they met to confer the first degree (entered apprentice), second degree (fellow-craft) and the sublime degree of master mason throughout the years. The scrivener of the records from which the microfilm was made undoubtedly was not a well-educated person for the writing of some of the entries is almost incomprehensible being replete with antiquated hieroglyphics. There is very little in the microfilm plates that is by any stretch of the imagination relevant to the question before me for determination. One of them refers to a letter of October 15, 1829 which was addressed to the master and wardens of the Grand African Lodge No. 459. Another refers to the by-laws and constitution of the Prince Hall Grand Lodge in the State of Massachusetts; another the declaration of independence proclaimed by the African Grand Lodge on June 18, 1827, and still another the charter issued to African Lodge No. 459, dated September 29,1784, by the Grand Lodge of England.
In the Georgia case hereafter referred to (Most Worshipful Prince Hall Grand Lodge, F. & A. Masons of Georgia v. Supreme Grand Lodge, Modern F. & A. Colored Masons of the World, 105 F. Supp. 315, 318 [Dec. 28, 1951]) the court said: “ Having waded through all the mass of evidence and listened to the argument, I have arrived at a clear conclusion, sufficient and satisfactory to my mind. I do not deem it necessary, nor do I believe it would serve any good purpose, to enter into a lengthy dissertation of the innumerable by-problems and questions raised and considered, or the historical facts of the case as between the plaintiff and the defendant.” This quotation applies equally to this case.
*393 Plaintiff Prince Hall Grand Lodge F. & A. Masons of New York has 60 subordinate lodges and almost all are in New York State; they are Negro lodges with a total membership of a little over 10,000. The defendant has 14 lodges with a total of about 479 members, 5 of the lodges being in New York State.
The Grand Lodge F. So A. Masons (white) within the State of New York did not come into being until 1781, prior to which time there had existed in the colonies the practice of free masonry through lodges which, up to then, were brought into being by charter or warrant under the authority of a provincial Grand Lodge which, in turn, came under the Grand Lodge of England. It is readily understandable that the Grand Lodge F. & A. Masons in New York came into being with the birth of our own nation.
The qualifications of the witness George E. Bushnell were conceded. Judge Bushnell had had a most distinguished career. In addition to his many other educational qualifications, and after practicing law for 12 years, he became a Justice of the Supreme Court of Michigan — which is the equivalent of our Court of Appeals — and later he was its Chief Justice. He testified that the Grand Lodge of plaintiff or the lodge from which it sprung (Prince Hall Lodge) has the only existing charter of any lodge in America originally granted by the Grand Lodge of England. There never has been any change in the position of the Supreme Council of the Northern Jurisdiction with respect to Prince Hall Masonry and there is no other Negro masonic body in the United States that the Supreme Council of the Northern Jurisdiction recognizes as being legitimate other than Prince Hall. This is the body that is the plaintiff here. The members of Prince Hall are not clandestine. With the War of 1812, every lodge in America was cut off by the Grand Lodge of England. That, however, was in no sense an erasure; it merely meant that there was no masonic intercourse or visiting between them.
The witness George W. Crawford was shown to be a distinguished citizen of New Haven, Connecticut. He is a mason, having been initiated in the Widows’ Son Lodge No. 1, Prince Hall Affiliation in 1909. He qualified fully as an historian and expert in masonic matters, especially in Negro masonry. He was an author on Negro masonry and has written the books “ Prince Hall and His Followers ” and “A B Cs of Scottish Bite Masonry ’ ’.
The testimony shows that this witness examined the proceedings and records of the Grand Lodge of the State of Massachusetts which previously had been recognized by the Grand Lodge *394 of England, and in this statement he referred to Prince Hall Affiliation, Prince Hall Grand Lodge. He is a lawyer of distinction, having held numerous public offices in the State of Connecticut. He has personally tried in other States nine cases on behalf of Prince Hall Masonry as against other alleged masonic bodies in this country and he testified that Prince Hall Masonry had its source from the mother Grand Lodge of Masonry, the Grand Lodge of England. Prince Hall (this was his name and not a title) was born in the Barbados, West Indies and came to Boston in 1775. During the siege of Boston in the Revolutionary War, Prince Hall and 14 other free blacks of Boston were initiated into an army masonic lodge attached to the command of General Gage of the British Army. Prince Hall died in 1807 and in 1808, in his honor, at a meeting of the Grand Lodge, they changed the name from African Grand Lodge to Prince Hall Grand Lodge.
The witness Amos T. Hall is an attorney from Oklahoma and a mason who occupies the position of Grand Master of Prince Hall Grand Lodge of the State of Oklahoma. He has appeared in many actions throughout the country by Prince Hall Masons against other alleged masonic bodies and among these cases were those in Oklahoma, Kentucky, Georgia, New Mexico, Kansas, Missouri, Pennsylvania, Illinois, State of Washington and Tennessee. He identified the volume “ A History of Free Masonry among Negroes in America, written by Harry E. Davis, deceased ” and stated that Davis was a resident and citizen of Ohio, a State Senator and a prominent lawyer in masonic circles. Hall went on to identify certain historical works including Samuel Clark’s “ The Negro Mason in Equity ” and William H. Upton’s book 11 Negro Masonry, being a critical examination on objections to the legitimacy of the Masonry existing among Negroes of America”. Both of these works were much more than 30 years old and were used in various trials throughout the country in which the witness participated.
The testimony of Ira L. Gibbons is not only unsatisfactory but sheds no light whatever on the issues before me.
The testimony of witness Ernest Seymour Bowrich is equally unsatisfactory and biased because at the very beginning of it he called himself “ the Grand Master of the Most Worshipful King Solomon Grand Jurisdiction ”. He did say that in their ritualistic work they used all of the paraphernalia that pertains to masonic work.
The testimony of witness Winston H. Gibbons is, likewise, unsatisfactory. He said he was the secretary general of defendant organization and one of its incorporators in the State of *395 New York, incorporated in June, 1959 and located in New York County. Though he testified he was made a mason in Fidelity Lodge in Brooklyn, he did not know whether it still was in existence nor that the Grand Lodge still existed in Brooklyn. With reference to the Provincial Grand Lodge, with which he was in some way linked, he said, ‘ ‘ They cannot act. They have no power over the subordinate lodge. Their powers are limited.”
Now I analyze the testimony of the witness Cusick, without whose testimony the defendants make out no defense. This witness did not offer himself as an expert but confined himself to the activity of research and survey and basically fact-finding in business, marketing and advertising problems of business organizations. A picture of this witness can be gleaned from his own testimony. He was voluble to the point of extravagance, though unconvincing. At one point, when defense counsel questioned and cautioned him to speak slower, he replied: “ Ain’t I speaking distinctly? I’m a public speaker, sir. The audience never tells me to stop.” I must confess there were many instances when it was almost impossible to make him stop. Again, he made it clear that when he went to look at records, he was only there as a reporter and historian.
At Boston, Massachusetts, where he made an examination of what was referred to as “ the big strong box ” at the Boston Safe Deposit Co., there were records, he admitted, of African Lodge No. 1 from 1778 to 1787, African Lodge No. 459 from 1787 to 1827, African Grand Lodge from 1827 to 1847, and the minute ■books of the Prince Hall Grand Lodge from 1848 to 1865.
At the voir dire of this witness, he admitted that his business was research and service in business marketing and advertising and that in this field he is engaged by clients to make surveys for them. Much of what he testified to came from his reading of books such as “ Negro Free Masonry in the United States ” by Harold Y. W. Yoorhis. Prior to 1949 he never had any interest or desire to trace the origin of Negro free masonry. Never has he published any articles or books of Negro free masonry nor has he written any pamphlets on the subject. He testified in two cases (still sub judice in a court in Philadelphia).
His self-appraisal of his status is evidence by his reply to the question, ‘ ‘ Are you saying that the colored Masons whom you visited in Massachusetts for the purpose of inspecting their archives were not regular Masons ? ”: “ Not from my viewpoint, no sir.” And immediately following that he admitted that when he examined the documents in the archives at Boston, he did not examine all of the documents. He admitted that there were documents which he did not have the time to read and examine *396 nor would lie say that the micofilm contained a photographic copy of every document in the strong box. He was in court as a paid witness at the rate of $50 a day and expenses.
Defense counsel readily admitted that he was not qualifying this witness as an expert on questioned documents. He did admit that Prince Hall received a charter from the Grand Lodge of England on September 29, 1784 but that it was not received in the States or former colonies until 1787.
Even under direct examination, Cusick, in his response to defense counsel, referring to ‘1 Free Masonry among men of color ’ ’ said of Prince Hall, ‘ ‘ He was the first black man to be initiated into the Masonic order in the American colonies.”
With some reluctance, Cusick recognized that Dr. Albert G. Mackey, a prominent physician of Charleston, South Carolina, was a recognized masonic scholar and further he admitted, in response to the court’s question, that on September 29, 1784 a charter for a Master’s Lodge was granted, although not received until 1787, this charter having been granted to Prince Hall and others, all colored men, under the authority of the Grand Lodge of England, and that the archieves of the Grand Lodge of England prove that. In response to the court’s question, “in other words, that there then was a charter granted to Prince Hall, is that right? ”, the witness replied, “ Yes, and his friends in Boston, that’s right, by the Grand Lodge of England, 1717 Grand Lodge. ’ ’ The witness also stated that the lodge bore the name of African Lodge which was situated in the City of Boston and that it had been African Lodge No. 1 until they received the number 459 in the charter from the Grand Lodge of England. Then from another historical work, the court asked, “Do you agree with this ‘ after some years it was revived but by whom and under what process of Masonic law is not stated ’? ” Here the witness hedged by saying, “Not necessarily revived but apparently in operation.” Also, he admitted that in the records from 1778 to 1784 there were references to degrees being-conferred.
The sum and substance of this witness’ testimony was that he recognized no historians, researchers or masonic experts, and whenever confronted with their writings, he did not hesitate to disagree with them purely on the basis that he did not find affirmative proof. He seemed to agree with no one but himself.
As to the existence of a disagreement between the two Grand Lodges of England, there can be no doubt, Cusick admitted, that after a lapse of years and through conferences, these two bodies were merged into one. Cusick’s whole attitude could be epitomized by the quotation: “ In matters controversial, my perception *397 is quite fine; I always see both points of view, the one that’s wrong’ and mine. ’ ’
As to these lodg’es whose proper masonic existence was questioned by the witness, he was forced to admit that contributions were made by them up to 1797. The lodges of free and accepted masons operating in England grew out of the masonic guilds which, in turn, were supposed to have traced their origin to the work done at the building of King Solomon’s temple. The witness stated: “ That’s the traditional history, yes, sir.”
Over quite a number of the pages of the testimony, it became apparent that his answers were not based on either facts which he found or on the basis of historical documents, and he covered his answers by the cavalier or facile statement that what he was saying was based on so much research as he had made. He was asked by the court: ‘ ‘ But this is evidence, is it not, to your mind as a researcher that African Lodge at some time was recognized by the Grand Lodge of England ? ” to which he replied: “It was chartered by it.” And defense counsel said: “ There’s no dispute about that.” To which the witness replied: “ We’re not disputing that, sir. It’s what happened to it afterwards.”
The masonic fraternity makes no distinction with regard to race, color or creed. . Any good man of lawful age who comes well recommended is eligible for any lodge.
When finally confronted with a question with respect to whether he found the origin of the three subordinate lodges to which he had referred, he said that it was not from any records but proceedings of the Grand Lodge of Ohio which they had published in 1883. This, of course, begs the question.
In plaintiffs ’ Exhibit 3 — this being the report of a committee of the Grand Lodge of Massachusetts, there was a factual finding that Prince Hall Masonry had its origin from the Grand Lodge of England.
Through 34 pages of his testimony, Cusick did not hesitate to disagree with what other recognized historians had said. He repeatedly answered questions put to him by defense counsel and his answers repeatedly were based, not on what he found but on what he did not find in his research, and yet he did not hesitate to express his opinions. Such a course of conduct falls within the rule of the case of Cassano v. Hagstrom (5 N Y 2d 643, 646). At one point he evidently forgot himself when the court posed the question. “ Did you find in any of them, as a researcher, reference to the fact that there was a charter granted to Prince Hall Lodge and also to African Lodge No. 4591 ” he replied: “ None of them deny that fact, sir, that the Grand Lodge of England granted a charter to African Lodge 459 on *398 September 29,1748 [should be 1784] located in the city of Boston, Massachusetts. It’s the subsequent events that the Grand Lodge disagrees with. ’ ’
Again he fell back on what had become a hackneyed statement with him. After referring to the African Lodge which subsequently became the Prince Hall Lodge, the following appears: “ the referee : What if it did convert itself into a Grand Lodge and that it was recognized as such for a long period of years ? What then would you say about it? ” to which he replied, “ I have never found any recognition of it, sir. ’ ’ But when the court put the question in another form and pressed him for his answer, he stated that he would not agree with it. This went on repeatedly. The witness had no hesitation in disagreeing with the ‘1 Encyclopedia of Fraternities ’ ’ and limited his recognition again to the comment that he recognized Albert C. Stevens merely “as a compiler of this encyclopedia but not as an authority on the subject of Freemasonry,” though he did use this encyclopedia as a reference. Once more he said: “I
remember the famous oft repeated story of March 6,1775, Prince Hall was initiated in an Army Lodge in General Gage’s Army in Boston. I disagree with that because I couldn’t find any documents to support it.”
I could go on and on dissecting this witness ’ testimony through his cross-examination and his redirect, but it would only serve to prove the utter worthlessness of his testimony.
I quote from Judge Desmond’s opinion in Cassano v. Hagstrom (5 N Y 2d 643, 646, supra) : “ It is settled and unquestioned law that opinion evidence must be based on facts in the record or personally known to the witness (Weibert v. Hanan, 202 N. Y. 328, 331; Marx v. Ontario Beach Hotel & Amusement Co., 211 N. Y. 33, 38). He cannot reach his conclusion by assuming material facts not supported by evidence (People v. Patrick, 182 N. Y. 131,172).”
The ancient documents which were offered and which appear in this voluminous record must be governed by the rule laid down in Coleman v. Bruch (132 App. Div. 716, 717) where McLaughlin, J., said: “ The general rule is that an ancient record or document which comes from the custody of a person which the court deems proper and is itself free from any indication of fraud or invalidity, proves itself. (Layton v. Kraft, 111 App. Div. 842; Matter of Webster, 106 id. 360; affd., 186 N. Y. 549; Dodge v. Gallatin, 130 id. 117, and cases there cited.) ”
There is no reported masonic case in the State of New York similar to the present case and counsel inform me it is of first impression in this State.
*399 While the decisions of courts in other States are not res judicata, nevertheless they are persuasive, informative and most helpful to an understanding of what here has heen litigated. I take up these cases from foreign jurisdictions, so far as possible, in chronological order:
Most Worshipful Grand Lodge of Ancient Free & Accepted Masons of West Virginia v. Most Worshipful Prince Hall Grand Lodge of West Virginia of Ancient Free & Accepted Masons (90 W. Va. 424).
This case was decided by the Supreme Court of Appeals of West Virginia in March, 1922. The plaintiff in the action sought to restrain the defendant from using words similar to those of plaintiff, and in the court below plaintiff was unsuccessful. On appeal, the Supreme Court of Appeals of West Virginia affirmed the dismissal of the decree entered below against plaintiff.
In that case defendant had obtained a charter from the Secretary of State and it was after this that the plaintiff’s suit was begun with the claim that it had the exclusive right to use the words “ Ancient Free & Accepted Masons ” or the letters “ A. F. & A. M. ” as a part of its corporate name. Among other things, the court said (p. 426): “ That a court of equity will interfere to enjoin the use of a name by a corporation so closely simulating that of another corporation as to result in fraud upon such other is very well established. Benevolent and Protective Order of Elks v. Improved Benevolent and Protective Order of Elks, 205 N. Y. 459; Supreme Lodge Knights of Pythias v. Improved Order Knights of Pythias, 113 Mich. 133; Emory v. Grand United Order of Odd Fellows, 140 Ga. 423.”
Further in the opinion, the court said (p. 427): “ The adopted words in this case indicate the work in which they are engaged. In English nomenclature they indicate to all, the uninitiated as well as the initiated, that the persons applying to themselves these terms are engaged in promulgating a principle of moral philosophy, having thousands of adherents among every civilized race of the world. To say that only the plaintiff’s membership may call themselves ‘ Masons ’ in West Virginia would be to give to it a monopoly in this great philosophical and moral principle, and no organization can ever secure a monopoly in practical benevolence and morality.”
And toward the close of the opinion, the court said (p. 427): “ That one may be denied the right to use a particular name in the conduct of his business because of his fraudulent conduct and fraudulent use thereof to the prejudice of another is too well established to require the citation of authority.”
*400 The case of Most Worshipful Widows’ Sons Grand Lodge of Ancient Free and Accepted Colored Masons of Pennsylvania v. Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Pennsylvania (160 Pa. Superior Ct. 595) was one arising in Pennsylvania which came to the Superior Court from a decree of the Court of Common Pleas in April, 1947. There the appeal was by defendant Most Worshipful Prince Hall Grand Lodge from an order overruling its exceptions to a Master’s report recommending approval of an application for a State charter. Again the decision was by a unanimous court of seven Justices. The decree of the court below was unanimously reversed and the application refused. In the course of the court’s opinion, it was stated (pp. 597-599):
‘ ‘ Men seeing that such an organization has acquired prestige and praise, may pay it the compliment of imitation, and thus is formed a new fraternity with different name and ritual. But others conceive the idea of appropriating the name, and thereby toritiously acquiring its g*ood repute. The motive may be covetousness, with an eye to the initiation fees and dues later to be converted into salaries and expenses. Or it may be retaliatory because of having been rejected for membership. Whatever the intent may be, its accomplishment begins with fraud, both on the original order and upon those who seek membership. Such schemes should not prevail. The principles hereinafter enunciated apply not only to the fraternity now involved, but to all fraternal organizations.
“ The evidence in this case shows that Prince Hall, a Negro, was initiated into the Masonic fraternity in Lodge No. 441, a military lodge of Irish registry, at Castle William, Boston Harbor, on March 6, 1775. With others of the fraternity he organized, in 1784, African Lodge No. 459, under a warrant issued by the authority of the Grand Lodge of England. This Grand Lodge of England was formed in 1717, but a schism developed and two Grand Lodges thereafter existed, dubbed the £ Ancients ’ (which was, in fact, the younger) and the £ Moderns ’ (the Grand Lodge of 1717). African Lodge No. 459 was instituted or warranted by the £ Moderns ’. In 1813 the £ Moderns ’ and £ Ancients ’ were reconciled and united as one Grand Lodge. Similar Grand Lodges were evolved in Scotland and Ireland. All legitimate Masonic lodges are descended therefrom; in America through state Grand Lodges originally composed of lodges created by a Grand Lodge of the British Isles. Lodge No. 459 of Massachusetts became a mother lodge, and in accordance with the usage of the fraternity, issued patents or warrants for the *401 foundation of new lodges, and finally itself became a Grand Lodge. Prince Hall was the head (Master) of African Lodge No. 459, and the head or Grand Master of it as a Grand Lodge. Among the lodges chartered by it was African Lodge No. 459 in Philadelphia. By the same evolutionary process it became the African Grand Lodge of Pennsylvania, and after the death of Prince Hall in 1807 it changed its name in honor of him to Prince Hall Grand Lodge. Not only was its beginning legitimate, but it has existed and functioned continuously since 1815, and is the exceptant here. Under the evidence it is clear and uncontradicted that the Prince Hall Grand Lodge was, and is, the one and only source of legitimate Negro Masonic lodges in Pennsylvania. ’5
In the case of Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Georgia v. Supreme Grand Lodge, Modern Free & Accepted Colored Masons of the World (105 F. Supp. 315 [Dec. 28, 1951]), it appeared that this case arose in the United States District Court of Georgia. It was an action to enjoin the defendant from the use of words in defendant’s name which impinged on those of the plaintiff. After the trial, it was stated (pp. 316-317):
‘1 "While there were only two parties to this case, a great deal of testimony, historical data and background were introduced by both the plaintiff and the defendant, with regard to York Free and Accepted Masons, Colored; the plaintiff offering the evidence in an effort to show that not only the defendant is spurious and existing illegally, but that the York Masons were in the same category, asserting as one of its contentions that it had the exclusive right to the use of the name, ‘ Free and Accepted Masons.’ The defendant introduced much evidence with respect to the York Masons in an effort to establish that that organization had used the words ‘ Free and Accepted Masons ’ over a very long period of time, and equally as long if not longer than the plaintiff, and that, therefore, the plaintiff was not entitled to the exclusive right to the use of that name. Because of the abundance of the evidence introduced with reference to the York Masons, that body will hereinafter be referred to.
‘ ‘ For convenience and brevity, the plaintiff will hereinafter be referred to as the 1 Prince Hall ’ Masons, the defendant as the ‘ Modern ’ Masons, and the York Free and Accepted Masons as ‘ York ’ Masons.
“ The plaintiff contended that it has had a very long, honorable, worthy history, dating back to the early days of this *402 country, and springing from the Grand Lodge of England, and that its existence throughout the country has been continuous.”
Further the court said (p. 317): “ The plaintiff further contends that the defendant is an illegal body, is illegally constituted, and that it is wholly devoid and without authority to carry on or conduct the business of a Masonic organization, and that in so doing it is injuring and damaging the plaintiff and handicapping its services, disrupting its operations, leading to confusion and misunderstanding in the public mind and to those who are interested in Negro masonry. The plaintiff further contends that the defendant is using the signs, symbols and regalia used by the plaintiff, and which by its long use has the right of continued use, undisturbed by the defendant.”
The case of Prince Hall Grand Lodge of Free and Accepted Masons, New Mexico v. Most Worshipful King Solomon Grand Lodge, A. F. & A. M. (Colored) of New Mexico and Jurisdiction (62 N. M. 255) was a case heard and decided in the Supreme Court of New Mexico in January, 1957. It appears that the Supreme Court of New Mexico is the equivalent of our own Court of Appeals. Below defendants were defeated. They appealed. Here again the court limited its finding and decision to the jurisdiction of New Mexico. However, it sheds light on what is contended for in the case before me. In the course of the opinion, the court cited a case in Georgia (Supreme Grand Lodge, Modern F. & A. Colored Masons of World v. Most Worshipful Prince Hall Grand Lodge, F & A. Masons, 209 F. 2d 156) where certiorari was denied by the United States Supreme Court (347 U. S. 953). Here, again, was a Prince Hall Grand Lodge which in the State of New Mexico was successful and its rival was repudiated. The judgment against the Most Worshipful King Solomon Grand Lodge (the defendant) was by a unanimous court of five Justices.
In the case of International Free & Accepted Modern Masons v. Most Worshipful Prince Hall Grand Lodge Free & Accepted Masons of Kentucky (318 S. W. 2d 46), there is language which is not only applicable in the case before me but which I accept, adopt and include in my findings. That case was decided by the Court of Appeals of Kentucky rather recently (Nov. 1958) and states (p. 48):
“A brief history of Freemasonry among colored people in America, as shown in this record and by historical references and in several judicial opinions, seems appropriate. Prince Hall, a free Negro, a native of Barbados, West Indies, became a worthy resident of Massachusetts. He knocked and the door of Masonry was opened to him by a British Military Lodge in *403 Boston in the year 1775. He was the first man of African descent to become a Master Mason in America. Hall became a Revolutionary War patriot, receiving recognition from General Washington and other leaders. After the war, Hall and his brethren were refused a charter by the Provincial Grand Lodge of Massachusetts because of their race. Upon their application, the Grand Lodge of England, ‘ under authority of His Royal Highness, Frederick, Duke of Cumberland, Grand Master of the Most Ancient and Honorable Society of Free and Accepted Ancient Masons,’ granted them a charter on September 29,1784, under the name of African Lodge No. 459, to be opened in Boston. That was done in May, 1787. Later, African Lodge No. 459 declared itself to be a Grand Lodge with jurisdiction throughout the United States, and the Grand Lodge of England granted a patent or provincial powers to the African Lodge as such. After the death of Prince Hall in 1807, the colored Masonic grand lodges changed their names in his honor and many succeeding lodges have adopted it.
“As time went along, Prince Hall Grand and subordinate lodges of colored Masons were chartered and organized throughout the United States, Canada and other countries, all of them springing from African Lodge No. 459. These historical facts are more or less confirmed by several judicial opinions. See, Prince Hall Grand Lodge of F. & A. Masons v. Most Worshipful King Solomon Grand Lodge, A. F. & M. (Colored) 62 N. M. 255, 308 P. 2d 581; Most Worshipful Widows’ Sons Grand Lodge of Ancient F. & A. Colored Masons of Pennsylvania v. Most Worshipful Prince Hall Grand Lodge of F. &. A. Masons of Pennsylvania, 160 Pa. Super. 595, 52 A. 2d 333; Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons, of Georgia v. Supreme Grand Lodge, Modern Free & Accepted Colored Masons of the World, D. C., 105 F. Supp. 315.”
There is a New York case which sheds considerable light on the issues which are before me. The case is that of Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World (205 N. Y. 459 [May 24, 1912]). Judge Baetlett wrote for a unanimous court. In the court below an injunction was granted as prayed for in plaintiff’s complaint against defendant. There the defendant corporation was organized under the Membership Corporations Law in 1907. Its full name was embodied in the certificate of incorporation. Its objects were defined as those similar to those of plaintiff. It had branch organizations in this State and elsewhere. There, as here, the question of color of the members had no legal significance in the litigation. Neither plaintiff nor defendant carries *404 on any trade or industrial or financial "business which could have been injuriously affected by the action of a similar body in appropriating its name. Judge Bartlett, after citing a New York case, said (p. 463): “where it was distinctly held that the right to relief by injunction against the misuse of a corporate name was not confined to business corporations, but extended equally to benevolent and patriotic societies. He pointed out that many corporations are created under the laws of this state which have nothing to do with trade or commerce, and that ‘ it would be a strange condition if the law could not protect them in that which it has encouraged them to do.’ His reasoning and conclusion commend themselves to our judgment and command our approval. (See, also, Salvation Army in United States v. American Salvation Army, 135 App. Div. 268, 274.) ” Later, in support of his conclusion, he cited the Illinois case of International Comm, of Y. W. C. A. v. Y. W. C. A. of Chicago (194 Ill. 194).
Further in the opinion, Judge Bartlett said (p. 464): “ The public policy of this state against permitting the use of misleading names by corporations of any character is evidenced by the legislation on the subject.”
The opinion then goes on to tell of the changes made in our General Corporation Law to repress the deceptive adoption of pre-existing corporate names by embodiment in the Penal Law of section 948 provisions making such action a misdemeanor. Then (p. 465) Judge Bartlett said: “ In case of a threatened violation the section goes on to provide for an injunction; and if it shall appear that the defendant is in fact using the name of a benevolent, humane or charitable organization incorporated as aforesaid, or a name so nearly resembling it as to be calculated to deceive the public, an injunction may be issued ‘ without requiring proof that any person has in fact been misled or deceived thereby. ’ ”
It then appeared that the defendant-appellant in the Court of Appeals argued that the names were not sufficiently similar to support the action — and this because defendant had preceded its name with the word “ improved ” and added to the plaintiff’s name the words “Of The World”. Further, said Judge Bartlett (p. 465): “ Indeed, the plaintiff’s organization has become so well and widely known simply as Elks (as the trial court has found) that the assumption of a title containing that appellation by any other independent benevolent corporation or fraternal order would in and of itself convey the false impression that there was some connection between them. Therefore, the learned judge at Special Term was right in enjoining the *405 defendant from in anywise using the word Elk or Elks as part of its title or incorporation.”
There is an ancient apothegm attributed to Blackstone that there is no wrong without a remedy.
There is much evidence that in colonial America there was the accepted practice of a lodge assuming the functions and prerogatives of a mother lodge. That is the way in which lodges developed into grand lodges.
A lodge or grand lodge, seeking recognition from another, does not imply that the lodge seeking such recognition acknowledges the superior position of the organization from which it seeks recognition.
St. Andrews Lodge of Massachusetts, while acting and functioning as a mother lodge, contributed regularly to the surety fund of its mother lodge (Grand Lodge of Scotland) during the late 18th century.
The plaintiffs have established a prior or better right as against that of defendants. I find that plaintiffs and its claimed legitimate predecessors, although often not using the exact name used at present, have had a favorable and continued existence in America since about the year 1787. I find that plaintiffs carry on and conduct fraternal and charitable functions and at all times conducted itself and its affairs in a highly honorable, legal manner and that it has used the words 1 ‘ Free and Accepted ’ ’ as a descriptive part of its name at all times during its existence in this country and in this State. As a matter of practice and Masonic procedure, plaintiffs and its members do not recognize defendants as being legally organized, legally existing or its individual members as being Masons, except, unless and until a member of defendants, seeking to affiliate with plaintiffs, is accepted. I find that defendants use the same ceremonies, rituals, insignia, symbols, emblems, badges, buttons, signs and other paraphernalia used by plaintiffs. I find that defendants ’ use of the title which it now uses is an infringement on the real name of plaintiffs and that the general public, in the exercise of ordinary care, might think or be led to believe that it is the name of plaintiffs (which had the first and prior right to the use of the name). I find as a matter of fact that the use of the words ‘ ‘ Free and Accepted ’ ’ by defendants is a fraud against plaintiffs which are entitled to the use of those words, and whoever the dominant controlling mastermind of defendants was, there is no doubt in my mind he intended to create the impression in the minds of the public that he and his associates were the ancient and original “ Free and Accepted ” Negro Masons, which they are not. I find that the adoption by defendants of the words *406 “ Free and Accepted ”, which are the distinctive features of plaintiffs, was done by defendants with the intent to deceive and defraud the public and reap the benefits of plaintiffs’ good will to the injury and damage of plaintiffs and to the confusion of the public. I find, according to Masonic jurisprudence, that defendants were not regularly and lawfully organized as Masonic bodies since they never had any charter, writ or warrant of authority from any authorized superior body.
Because of all of the foregoing, I find that defendants are not authentic masonic bodies; that they are — from a purely masonic point of view- — ■ spurious, clandestine and illegitimate and that they have no right to use the words ‘ ‘ Free and Accepted ’ ’ in their Masonic name nor in that of any of their so-called subordinate lodges or affiliates. Plaintiffs relied upon their common-law rights to protect their name as against defendants.
Plaintiffs, without doubt, have activities which are fraternal and charitable and have had these over such a long period as to give them an interest in and the right to use the words “ Free and Accepted ’ ’ and that they had a value therein to themselves and to the members they recruited and were entitled to enjoy it.
Defendants’ plea of laches is unavailable to them for it is the invariable rule that a litigant coming into a court of equity must come in with clean hands. Here the hands are soiled beyond any excuse. The underlying principle is that equity refuses to lend its aid in any manner to one seeking its interposition who has been guilty of unlawful or inequitable conduct in the matter in relation to which he seeks relief. Tersely stated, the doctrine of laches cannot be invoked to defeat justice (Bunch v. United States, 252 F. 673).
Plaintiffs could not possibly be expected to proceed simultaneously in all of the States of the union where their possessive rights were or are infringed upon, nor does the fact that there are other organizations as hybrid or clandestine as defendants justify the defense of laches. The cases in support of this are numerous.
In keeping with the decision in the Elks case (supra), I do not forbid defendants from using the same titles for its officers as those borne by the officers of plaintiffs. Here I can see no objection to defendants using the title of worshipful master, senior warden, junior warden, senior deacon, etc., but I cannot sanction defendants using the same ritual, insignia or emblems as those of plaintiffs, namely, the Holy Bible on the altar in the lodge room, the square and compass, the perfect ashler, the three lights surrounding the altar, etc. The practical effect of my decision is to compel defendants to adopt another name which contains no *407 reference to the last degree A. & A. Scottish rite. Defendants may, under another name, continue their commendable activities, if they have any. They may not, however, hold themselves forth as a Masonic organization. It is this virtual misrepresentation that an injunction will order discontinued.
From what has been said by me, the plaintiffs are entitled to the injunction sought and it is so ordered within the limitations of my findings of fact. I do not restrain the defendants, its subordinate lodges nor the individual members thereof from petitioning any lodge of plaintiffs for membership and affiliation. The defendants and their subordinate lodges will be ordered to surrender to the plaintiffs all of their paraphernalia and other Masonic implements (such as were referred to in the stipulation at the opening of the trial).
Other separate defenses are dismissed, and since there is no evidence supporting the claim of money damage, none will be awarded. Costs will be allowed plaintiffs against defendants.