Norman R. Goodfarb et al., Respondents, v Lionel Freedman et al., Appellants.

Second Department, September 2, 1980

## APPEARANCES OF COUNSEL

*Martin I. Kaminsky* and *Fred R. Profeta, Jr.,* for appellants.

*Litt, Hulnick & Giordano (Arthur A. Litt* of counsel), for respondents.

## OPINION OF THE COURT

LAZER, J. P.

The parties to this action are neighboring property owners in a small residential community in the Village of Ardsley known as "Twenty-One Acres." The plots in Twenty-One Acres all exceed one acre in area and were developed by the individual owners during the years 1948 through 1952. In order to maintain the natural, wooded nature of the obviously affluent community, the owners entered into a series of restrictive covenants. One such covenant provided that "[t]here shall not be erected upon this plot more than one private residence for occupancy of one family, and garage for not more than two cars appurtenant thereto. With the exception that part of said private residence may be used for the

practice of a duly licensed profession." *[Sic.]* Another restriction required front and side yard setbacks of 50 and 25 feet, respectively. The current defendants, Lionel and Celia Freedman, and plaintiffs Janet Ullman and Alan B. and Eva Tulipan were among the original plot owners. In 1972 the plaintiffs Norman R. and Rowena Goodfarb purchased the property adjoining that of the Freedmans and became quite friendly with them.

In August and September of 1975, the Freedmans applied to Ardsley Zoning Board of Appeals for a variance to build a photographic studio on their lot which already contained a substantial residential dwelling and a detached two-car garage. Lionel Freedman, who is a commercial photographer, accompanied his application to the board of appeals with a letter stating that he hoped "to be able to build a studio structure attached to [the] garage * * * for the purpose of practicing my profession of photographic illustration." The application sought a relaxation of the front yard setback requirements of the Ardsley zoning ordinance but made no mention of the yard requirements contained in the Twenty-One Acres restrictive covenants. Because of the commercial implications involved, the board of appeals required the Freedmans to send a second notice of hearing to neighboring property owners. The notices referred to a variance of the front yard setback for the construction of a "studio."

None of the plaintiffs attended the public meetings nor examined the plans on file with the board of appeals. The Goodfarbs were told by Mr. Freedman that the studio mentioned in the notices would be small—about the size of a bedroom or two-car garage—and that it would not be a commercial building but solely a place in which he would engage in his hobbies. Ultimately, the board of appeals granted the variance on condition that no products be sold from the studio.

After excavation began in the spring of 1976, Dr. Montague Ullman, husband of plaintiff Janet Ullman, telephoned the Freedmans to question them and complain about the excavation. Mr. Freedman informed Ullman that he was in possession of a waiver of the front yard setback from the Twenty-One Acres titleholders, signed in 1952, permitting the construction. When Ullman said he could not remember such a waiver and asked to see it, Freedman responded that he would get back to him. The Freedmans did not attend a meeting of

the neighbors which was then called but Mr. Goodfarb explained to the assemblage that his good friend Lionel Freedman was only planning to build a small studio for his hobbies. Goodfarb also agreed to ask Freedman to let him see the waiver. When he did, he was shown a paper dated March 15, 1952, signed by all but one of the original titleholders of Twenty-One Acres, waiving the 50-foot setback requirement for "the purpose of building a carport, and necessary retaining walls, and/or studio." The last three words were on the last line before the place for signatures on the waiver form. Goodfarb then told his neighbors what he had seen.

Following excavation, the foundation was poured and the rear retaining wall was put up. The remaining walls were constructed by Mr. Freedman and a high school helper working primarily weekends in the summer of 1976 and 1977. In August, 1977, when the size of the new structure in the Freedmans' front yard area put the lie to the words "a small studio"—the building is 40 by 32 feet in dimension with a front wall 40 feet in width and 28 feet in height facing the street—the neighbors confronted the defendants, obtained no satisfaction and, relying on the original restrictive covenants, subsequently commenced this action.

In their amended complaint, plaintiffs demanded judgment enjoining the defendants from erecting any structure on or conducting any business from the premises and for various amounts of damages in favor of the three sets of plaintiffs. The defendants answered with denials and asserted the defense of laches, claiming that plaintiffs had delayed bringing any action for two years. When the suit was instituted on October 24, 1977, the studio structure had not achieved completion, but plaintiffs sought no preliminary injunction and the Freedmans now contend that they expended additional sums on construction during the pendency of the trial. At the commencement of trial on March 23, 1979, the building was still unfinished.

During the trial, at which the defendants denied many of the allegations against them and raised the issue of plaintiffs' delay in bringing the action, two of the original owners in the community (who had since moved elsewhere) testified that the words "and/or studio" had not been part of the waiver when they signed it in 1952. Special Term found that the comma after the word "walls" "was written over a period which had been there under the comma" and that the words "and/or

studio" were not part of the original waiver, which referred only to a carport. On the issue of laches, the court noted that the waiver had been shown to the Goodfarbs who related its existence to the Ullmans and that it deterred them from "pursuing their objection" further. The court also found that Mr. Freedman's assurances to the Goodfarbs that the studio would be a small one led the latter to convey this information to the other residents and was "undoubtedly another factor in misleading the plaintiffs in their delay of bringing the action to enforce [their] rights".

Special Term declared that the Freedmans' representations to the zoning board of appeals and the expenditure of $26,000 made it difficult to accept Lionel Freedman's testimony that he had abandoned his commercial intentions and desired to use the studio solely for his hobby. In its oral decision, the court stated that it found from "personal observation that this studio building, which it has been testified is from twenty-eight to thirty feet above the floor level, but actually in appearance is higher than that because the Court's observation of the land shows that the steep bank between where the building is and the road is probably another six or eight feet, so that this building stands up like a big vacant barn on the horizon of the very low, secluded houses, and, certainly is, in the Court's opinion, a very definite eyesore to an exclusive neighborhood. The Court realizes that the eyesore may be somewhat ameliorated after brick is put upon the concrete blocks and maybe a few architectural improvements are put upon the surface, but it will still stand up there like a sore thumb, completely out of character, and the Court believes that the danger of having something like this in an exclusive neighborhood, something which can so easily be translated into a building for commercial purposes, is entirely against the restrictive covenant". The injunctive relief sought was then granted and the defendants were given 90 days to "demolish and remove said studio building". No damages were awarded.

Since Special Term's determinations were founded in substantial degree upon matters of credibility, on their appeal the Freedmans have turned much of their focus from their original emphasis on plaintiffs' laches in failing to take action earlier to plaintiffs' omission to make any effort to preserve the *status quo* once the action commenced. The Freedmans argue that plaintiffs' failure to move for a temporary injunc-

tion resulted in further expenditures for construction after the lawsuit began thus depriving the plaintiffs of the right to the remedy of demolition. It is also contended that the court misconstrued the restrictive covenant in question and that irreparable injury was not established, so that damages should be considered as an alternative to the mandatory injunction if outright reversal is not granted.

In urging that the failure of the plaintiffs to restrain construction between service of the summons on October 24, 1977 and the beginning of trial on March 23, 1979 bars them from obtaining a mandatory injunction, the Freedmans' principal reliance is on our holding in *University Gardens Prop. Owners Assn. v Schultz* (272 App Div 949). In that case, the plaintiff sought to enforce a restrictive covenant and obtained a decree requiring the defendant to remove the dwelling on his premises. This court reversed the decree, stating (p 949): "Respondent [plaintiff] was slow to invoke the process of the court to preserve the *status quo.* Its failure to apply to the court to enjoin the continuance of construction of the building from the time that it knew such construction had commenced until the trial of the action, during which period the building was completed at considerable cost to appellant [defendant], was an inexcusable delay, which will not be countenanced in an action for such injunctive relief."

■ The defendants' postulation of postsummons laches as a substitute for their failed contention of preaction laches suffers from two serious ailments. Since their current theory was not raised at nisi prius it runs afoul of the rule that issues unraised at the trial level should not be considered on appeal (see *Smith v Stewart,* 45 AD2d 853, affd 38 NY2d 747; *Costal Commercial Corp. v Kosoff & Sons,* 15 AD2d 730). And even worse, their failure to raise the issue at trial deprives the Freedmans of a record sufficient to support the newly launched contention. Successful invocation of the defense of laches requires proof of prejudice as well as lapse of time (*Marcus v Village of Mamaroneck,* 283 NY 325; 2 Pomeroy, Equity Jurisprudence [5th ed], § 419d). Unfortunately for the Freedmans, the record does not reflect how much money they spent on the construction once the lawsuit began. During the trial, both counsel stipulated that the amount expended by the Freedmans up to September 1, 1977, shortly before they were sued, was $26,454. In closing arguments when the trial ended, the Freedmans averred that the plaintiffs' laches had caused

them to spend $26,000 to construct the studio building. To establish sums spent after the action began, the defendants point only to two questions asked of Lionel Freedman on cross-examination and two photographs in evidence. But all the record shows is that Mr. Freedman responded, "That's correct", to two questions as to whether he had spent more money on construction since September 1, 1977. The photographs, one taken prior to the action, and the other at the time of trial, are now proffered as evidence of the additional construction which took place after initiation of the litigation. While both photographs—originally offered for other reasons —show a large structure partially lacking in brick facing, it is difficult, if not impossible, to discern from them whether anything additional was done to the building between the times they were taken. In any event, since the preaction photograph was made four months before the action began, its utility for comparison purposes with a photograph taken at the time of trial is clearly dubious. What the defendants have, then, is their statement that sums were expended on construction after September 1, 1977, but there is no indication as to how much, if any, was spent after October 24, 1977 when the legal action commenced. As a consequence, the element of "considerable cost" relied upon by the *University Gardens* court (272 App Div 949, *supra*) is not available to the Freedmans.

On this record, moreover, defendants' reliance on *Finn v Morgan Is. Estates* (283 App Div 1105, modfg 124 NYS2d 645), and *Forstmann v Joray Holding Co.* (244 NY 22) is misplaced. In *Finn (supra)*, the laches of which the court spoke occurred before the action was commenced, for the structure was 70% completed by that time. Here, preaction laches is not available to the defendants because of their own conduct in misleading their neighbors into inaction. *Finn (supra)* thus restates the familiar proposition that laches may bar a remedy but it does not advance the Freedmans' cause. The *Forstmann* case *(supra)* is important but it does not redound in defendants' favor. *Forstmann (supra)* involved a business building constructed at Seventieth Street and Madison Avenue in New York City, a business zoned district, in which defendants' property was restricted to residential use by a covenant which still had five years to run. In striking down a mandatory injunction, the Court of Appeals indulged in a balancing of the equities, noting that the covenant would terminate in five years; the

block had no special advantages for residence purposes; the value of defendants' property for residential purposes was small; and finally (p 31): "The destruction of defendants' building or the denial of their right to erect such a building would inflict a loss on defendants and would neither add to the value of plaintiffs' property nor make their building more desirable for residence purposes."

Having undertaken this four-factor analysis which, in essence, struck down the restrictive covenant, the court noted that the defendants, "in what appears to be at worst an honest mistake of law as to the effect of the restrictive covenant," had spent a large sum of money and if they were fast to build the "plaintiffs were slow to invoke the process of the court to preserve the *status quo." (Forstmann v Joray Holding Co., supra,* pp 31-32.)

■ When the *Forstmann* criteria are applied to the instant facts, affirmance seems well warranted. Thus, the current restrictive covenants run with the land and are not limited by time; the Twenty-One Acres area has special advantages for residential use and constitutes an ideal residential setting; the defendants' property is residential in nature and clearly has significant value for such use; and while it is apparent that demolition will impose a financial loss upon the defendants, the eradication of their offending structure obviously will add to the value of their neighbors' property. Plaintiffs' real estate expert testified that the Goodfarbs' property was reduced in value by 20% and that of the other plaintiffs 10% as a result of the structure.

■ Defendants' dependence on renewed laches is vitiated by yet another flaw. Although our reliance on the plaintiffs' argument that "the rule of laches is never applied in favor of the perpetrator of a carefully designed and studied scheme of fraud" *(Gallagher v New England Mut. Life Ins. Co. of Boston,* 19 NJ 14, 23) has more application to the claim of preaction laches than it does to the Freedmans' current theory, it still bears some relevance to the instant problem. Laches as an issue is addressed to the sound discretion of the court *(Dalsis v Hills,* 424 F Supp 784), which should be reluctant to invoke it to defeat justice *(Bunch v United States ex rel. Townsend,* 252 F 673; *Prince Hall Grand Lodge F. & A. M. of N. Y. v Supreme Council of U. S. of Sovereign Grand Inspectors Gen. of 33rd & Last Degree A & A Scottish Rite,* 32 Misc 2d 390). Balancing

all of the considerations before us, we cannot but conclude that the result would be inequitable and justice frustrated if the Freedmans' studio were permitted to remain in existence. "[T]he equities"—as Judge POUND expounded in *Forstmann (supra,* p 32)—include "all the facts and circumstances which help to show what is just and right between the parties". In that light, Special Term's mandate of demolition is well supported by the record. While it is true that an obligation to invoke the aid of the courts to restrain continued construction arose when the plaintiffs became aware of the deception practiced on them, by that time the Freedmans' building seems to have been substantially completed. The *University Gardens* edifice *(supra)* was only 50% complete when that action was commenced and it was finished at considerable cost to the defendant during the pendency of the suit. Here, the total absence of proof as to the sums expended by the Freedmans or the progress of construction after the lawsuit commenced is ruinous to the claim of prejudice. While we do know that some money was spent after September 1, 1977, there is no proof that the expenditures continued pending trial nor, if they did, that the amount involved was substantial enough to establish change of position or prejudice within their meaning as laches concepts. At the end of the trial, the defendants had not moved from their position that the construction had cost them $26,000, the same amount stipulated as spent as of the time the suit commenced.

■ There are thus two vital differences between *University Gardens* (272 App Div 949, *supra)* and this case. *University Gardens* involved no claim of fraud and it was established in that case that considerable sums were expended after the suit was brought. The current proof demonstrates grossly deceptive conduct on the part of the defendants with severe consequences in a well-designed and well-planned residential community whose owners had contracted with each other to maintain a desirable rural and noncommercial setting for the mutual benefit of all. Thus, we should not deny the plaintiffs the relief they obtained upon trial of the issues.

As to defendants' argument that the restrictive covenants do not prohibit a third structure on the premsies, it is palpably meritless. For the purpose of clarity, we restate the language in issue. "There shall not be erected upon this plot more than one private residence for occupancy of one family, and garage for not more than two cars appurtenant thereto.

With the exception that part of said private residence may be used for the practice of a duly licensed profession."

According to defendants, this means only that more than one *residence* is prohibited but it does not prohibit other types of additional structures. By this interpretation, then, the drafters of the covenant were seeking to prevent additional residential structures but not additional commercial, industrial or other nonresidential structures. Such a contention need not detain us long, for in the words of the immortal CARDOZO, "If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided" *(Outlet Embroidery Co. v Derwent Mills,* 254 NY 179, 183). The claim posited is the sheerest absurdity.

Finally, we do not believe monetary damages are an adequate substitute for removal under the instant circumstances. The right to specific performance of a restrictive covenant by a decree in equity rests in judicial discretion and may be granted or withheld upon consideration of all the circumstances *(Zipp v Barker,* 40 App Div 1, affd 166 NY 621). Thus, whether an injunction should issue depends on all the equities between the parties and upon the facts and circumstances of the particular case *(Syracuse Supply Co. v Railway Express Agency,* 45 Misc 2d 1000). An injunction which will work hardship or oppression upon a defendant with comparatively slight corresponding benefits to the plaintiff will be withheld *(Haber v Paramount Ice Corp.,* 239 App Div 324, affd 264 NY 98; *Horton v Niagara, Lockport & Ontario Power Co.,* 231 App Div 386; *Herrman v Hartwood Holding Co.,* 193 App Div 115; contra, *Squaw Is. Frgt. Term. Co. v City of Buffalo,* 246 App Div 472, mod on other grounds 273 NY 119), especially when the defendant acted in good faith or plaintiff expressed a willingness to accept monetary relief (see *Corley v Spitzer,* 235 App Div 703; *Goldbacher v Eggers,* 38 Misc 36, affd 82 App Div 637, affd 179 NY 551). But, where the wrong was unwarranted or where the defendant acted with full knowledge and planned his violation of plaintiff's rights, his position does not appeal to the equitable conscience and an injunction should issue *(Bullock v Steinmil Realty,* 1 Misc 2d 46, affd 3 AD2d 806; *Todd v North Ave. Holding Corp.,* 121 Misc 301, affd 208 App Div 854; *McKenna v Levy,* 182 App Div 678; *Cummins v Colgate Props. Corp.,* 2 Misc 2d 301; see, also, *Pavia v Medcalfe,* 45 Misc 2d 597, affd 26 AD2d 621).

Here, the violation—continuing in nature—is substantial,

and, if plaintiffs' expert is to be believed, the damages caused by it exceed by twice the Freedmans' proof of their own construction costs. Indulging comparative damages, we find plaintiffs' are greater; indulging comparative equities, we conclude defendants merit no compassion from equity. Therefore, the mandatory injunction should stand and the studio structure should be removed.

Accordingly, the judgment should be affirmed.

RABIN, GULOTTA and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Westchester County, entered April 17, 1979, affirmed, with costs.